FOURNET, Chief Justice.
The plaintiff, John J. Matassa, a resident of the Sixth Ward of New Orleans and a member of the Louisiana House of Representatives from that ward, alleging that as a result of a conspiracy to defeat him in his bid for election to the office of Constable of the First City Court of New Orleans, the defendants, Clyde F. Bel, Sr., the incumbent constable who was seeking rc-clection; his campaign manager, George Credo ; and the Times-Picayune Publishing Company,[1] maliciously caused to be published in the Times-Picayune — a daily morning paper with a wide publication in New Orleans and Louisiana, as well as the states of Alabama, Mississippi, and Texas — a libelous article attacking his personal, business, and political reputation, instituted this suit to recover damages [2] against all three in solido. The matter is now before us on a writ of certiorari granted on plaintiff’s application in order that we might review the judgment of the Court of Appeal for the Fourth Circuit affirming the judgment of Division “C” of the Civil District Court for the Parish of Orleans that dismissed plaintiff’s suit against the defendants Bel and Credo [3] on their exception of no cause of action, this being predicated on the contention the publication forming the basis of the suit was protected under the rule of fair comment and criticism, as well as being qualifiedly privileged, inasmuch as it concerned the activities of the plaintiff as a person in public office and one who held himself out as a candidate for public office, *299 and was, therefore, not actionable. See, 156 So.2d 250.
“The very foundation upon which the law of libel is laid is the protection of reputation. The right to a good name and fame is as absolute and as essential to the ‘pursuit of happiness’ as is the right to life and liberty, characterized in our Declaration of Independence as among those ‘inalienable rights with which all men, being created equal, are endowed by their Creator.’ A man’s reputation is recognized to be as invaluable, and is given the same dignity in the Bill of Rights that comprises Article I of our constitution, as his right to due process of law in the protection of his life, liberty, and property (Section 2); freedom of religion (Section 4) ; freedom of speech and of the press (Section 3); peaceable assemblage (Section 5); and freedom from unreasonable searches and seizures (Section 7) ; for in Section 6 of this article we find the guaranty that ‘All courts shall be open, and every person for injury done him in his rights, lands, goods, person or reputation shall have adequate remedy by due process of law and justice administered without denial, partiality or unreasonable delay.’ Thus the general declaration in Section 3 of the Bill of Rights that ‘No law shall ever be passed to curtail or restrain the liberty of speech or of the press,’ is not only qualified by the clause immediately following that ‘any person may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty,’ but also by the specific guaranty in Section 6 that the courts are open for the redress of injury to reputation by the irresponsible use of the right to freely express one’s sentiments.” Kennedy v. Item Co., 213 La. 347, 34 So.2d 886.
In order to avail oneself of the rule of fair comment and criticism the publication must be one made “with an honest purpose, without malice, based on facts, * * * restricted to a man’s acts or works” and, in addition, it “must not attack him in his private character nor convey imputations of an evil sort except so far as the facts, truly stated, warrant the imputation.” And for the publication to enjoy a qualified privilege, the statement must be prepared bona fide, with the view to preventing or punishing some public abuse, in which case it is considered as justified as a duty owed to society, providing it does not “meet the objection of having been made maliciously and without probable cause.” Madison v. Bolton, 234 La. 997, 102 So.2d 433, and the extensive authorities therein cited.
As was very aptly observed in that case, “while the great weight of authority supports the view that publications concerning political matters, public officers, and candidates for office are entitled to a measurable privilege by reason of the pub- *301 lie interest involved, there are recognized limitations on the rule, foremost among these being that the statements must not be motivated by actual malice,” and, further, that “persons holding or aspiring to public office are not wholly without the protection of the law, since it is generally held that accusations of dishonesty or corruption and imputations of dereliction of duty or misconduct in office are not privileged.” (The emphasis has been supplied.)
The plaintiff having alleged in his petition that as a result of a conspiracy entered into by the defendants for the purpose of defeating him in his race for Constable of the First City Court of New Orleans defendants caused to be published in the Times-Picayune on March 2, 1962, the article forming the basis of this suit, which is set forth at length in the petition and reproduced in the appellate court decision, that was not only false hut made with malice, and which allegations must be accepted as true for the purpose of disposing of the exception; and inasmuch as a mere reading of this publication as a whole implies, as it does, that plaintiff was not a fit person to hold the public office he was seeking because he was guilty of irregularities while manager of the New Orleans Airport by selling material without authority and retaining the cash, using petty cash for paying bills not due by the airport, diverting material and labor to a clubhouse owned by him and to his mother’s house, and purchased other materials that were not properly accounted for, particularly in view of the further allegation that after full and complete investigation plaintiff was exonerated of these charges, which information was, in fact, carried in a news item in the October 7, 1950, issue of the Times-Picayune and purposely left out of the 1962 publication forming the basis of this suit in furtherance of defendant’s scheme against the plaintiff, is clearly libelous and actionable.[4]
The plaintiff has, therefore, clearly stated a cause of action, and is entitled to have his day in court for a trial of the case on the merits and to there prove, if he can, that the statement was made with malice, that is, as stated in the most recent expression on that subject by the United States Supreme Court, “with knowl *303 edge that it was false or with a reckless disregard as to whether it was false or not.” See, New York Times Co. v. Sullivan, 84 S.Ct. 710.
For the reasons assigned, the judgments of the district court and the Court of Appeals are reversed, the exception of no cause of action is overruled, and the case is remanded for further proceedings consistent with law and the views herein expressed. All costs in this court are to be paid by the defendants; all other costs are to await the final determination of the case.
HAMITER, J., dissents, being of the opinion that the judgment of the Court of Appeal is correct.
HAMLIN, J., dissents with written reasons.

. While the suit was pending, the Times-Picayune Publishing Company became a corporation, and, in its new capacity, was substituted as a party defendant in the place of its predecessor.

. Plaintiff sought to recover $50,000 for humiliation and mental suffering, $50,000 for damage to his reputation and character, and $200,000 for loss of the emoluments and salary of the office he was seeking.

. The writ was “Granted as to the sustaining of the exception of no cause of action filed by Bel and Credo.” The application was denied as to the Times-Picayune because the plaintiff had admitted, in a deposition taken during the course of the proceeding, that, to his knowledge, the Times-Picayune Publish- ‘ ing Corporation boro him no malice.

. The article published in the Times-Picayune in August of 1950, some 12 years prior to the 1962 election in which plaintiff was engaged, which is not a part of this proceeding but found in the record as a result of action taken by the publishing company in this matter clearly shows that the President of the Orleans Parish • Levee Board, the state agency having jurisdiction over the New Orleans Airport, and the plaintiff were in agreement that the proper forum for a full and complete investigation of the reported “irregularities” in the accounts and management of the airport while plaintiff was its manager was the Orleans Parish Grand Jury, and that that body had, in fact, as alleged in the petition, completely exonerated the plaintiff after such an investigation.