191 So.2d 727 (1966)
Edwin A. WALKER, Plaintiff-Appellee,
v.
The ASSOCIATED PRESS and the Times-Picayune Publishing Corporation, Defendants-Appellants.
No. 10585.
Court of Appeal of Louisiana, Second Circuit.
October 31, 1966.
Rehearing Denied November 29, 1966.
*729 Hargrove, Guyton, Van Hook & Ramey, Shreveport, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, Wells, Thomas & Wells, Jackson, Miss., for appellants.
Wilkinson, Lewis, Woods & Carmody, Shreveport, Watts, Looney, Nichols & Johnson, Oklahoma City, Okl., for appellee.
Before HARDY, GLADNEY, and AYRES, JJ.
GLADNEY, Judge.
This case is on appeal from a judgment rendered in favor of Edwin A. Walker, as plaintiff, and against the Associated Press and the Times-Picayune Publishing Corporation, as defendants, in an action for libel.[1]
The plaintiff alleges the Associated Press, through its reporter, Van Savell, sent news items and releases to the Times-Picayune Publishing Corporation which contained false, malicious, defamatory and libelous statements against him that were circulated and delivered to subscribers and news agencies in Caddo Parish, throughout the state of Louisiana and other states of the United States and in foreign countries; that these articles as published in the Times-Picayune and New Orleans States-Item falsely and unfavorably reflected upon his character and reputation, charged him with unpatriotic and criminal acts in the Mississippi crisis in leading attacks against United States marshals and in inciting students to rebellion against constituted authority. Walker testified that he appeared on the campus purely as an observer and that in his speech on the campus he remonstrated with the crowd to avoid violence. Categorically, he denied he assumed command of or led the rioters at any time.
The principal defenses urged on the merits of the complaint are, first, that the alleged libelous publications were and are true in substance and in fact; and second, that the alleged publications were fair comment, were made without actual malice, and being privileged, are protected from the claim of libel by the First Amendment to the Constitution of the United States. Additionally, it is contended the trial court denied defendants a fair trial; that the court was in error in failing to sustain exceptions of improper cumulation of actions and erred in failing to sustain an attack upon Article 74 of the Louisiana Code of Civil Procedure as an unconstitutional abridgment of the rights of defendants under the First and Section 1 of the Fourteenth Amendment to the Constitution of the United States. Finally, it is argued the award of damages was greatly excessive.
The statements complained of were admittedly published by defendant's newspapers as related incidents connected with the riot which occurred September 30, 1962 on the campus of the University of Mississippi. Plaintiff is reported as leading a charge against the United States marshals *730 and assuming command of the rioters who were responsible for the attack.
Following a series of events related to the admission of James Meredith as the first negro student of the University of Mississippi, which culminated in judgments of civil contempt rendered by the United States Court of Appeals, Fifth Circuit, against Governor Ross R. Barnett and Lieutenant Governor Paul B. Johnson of the State of Mississippi, General Walker issued statements on September 26 and September 28 over radio stations at Shreveport and New Orleans, Louisiana, calling for the support of Governor Barnett and he himself proceeded by private plane to Jackson, Mississippi, arriving there on September 29, 1962.
While at Oxford on the evening of September 30, General Walker listened to an address by the President of the United States in which the President announced the federalization of the Mississippi National Guard in order to preserve law and order if needed. During the afternoon of that same date and after the arrival of Meredith United States Marshals took positions on the campus around the Lyceum Building in which are the administrative offices of the University of Mississippi. Members of the Mississippi State Highway Patrol, under the command of Colonel Birdsong were deployed in front of the marshals. After the address of the President, General Walker and a friend, Louis Leman, proceeded by car to the University campus down University Avenue. At this time, about 8:45 P.M., people were standing on both sides of University Avenue and moving up and down the sidewalk. General Walker was recognized by a number of people standing along the street. He proceeded to a point on the sidewalk southeast of the Confederate Monument at the intersection of University Avenue with University Circle. Shortly thereafter the Mississippi State Highway Patrol began driving away around University Circle and down University Avenue. This caused an unfavorable reaction from the crowd and it was at this time plaintiff acceded to a request to speak. While speaking only for five or ten minutes he stood on the northeast side of the Monument. His audience was estimated at from 200 to 500 people. When Van Savell, the reporter of the Associated Press, arrived at the Monument, Walker was already speaking.
After the United States marshals and members of the Mississippi State Highway Patrol had deployed in front of the Lyceum Building, students returning from the weekend gathered in the vicinity and began taunting and jeering the marshals. As the evening wore on the temper of the crowd changed and what had started as a pep rally by students became an angry hostile mob which grew until about 8 o'clock P.M. there were more than 1,000 people in the general area. The rioters were forming into groups and moving towards the marshals, throwing bricks, bottles, rocks and other missiles before being repulsed by tear gas. The bricks, stones and other missiles hurled by the rioters at the marshals were, for the most part, obtained from construction materials at the site of a new building (Hume Hall) southeast of The Circle, which was then under construction. Concrete benches inside The Circle along the sidewalks were broken up and used as missiles. Upon being repulsed by tear gas the students would return to the supply of ammunition and then turn and proceed towards the marshals. The rioting continued until about Midnight when federal troops arrived and cleared the campus. At the time General Walker arrived at the campus the riot was in full progress.
The case was presented to the jury following three weeks of trial, the record of which includes the testimony of many witnesses who were in the immediate vicinity of appellee during his presence on the campus. The evidence imposed upon the jury the responsibility of deciding the truth or falsity of the alleged defamatory words and whether they were published with malice. Although the accounts given by these *731 witnesses, particularly as to what plaintiff said in the speech and with respect to his conduct on the campus, are conflicting, the record presents substantial supporting evidence for the jury's verdict, which found to be false the published statements that General Walker took command of and led the crowd.
The trial court in its charge to the jury correctly stated that every person has a right to comment on matters of public interest and general concern, provided he does so fairly and with an honest purpose, and that such comments are not libelous, however severe in their terms, unless they were written maliciously. Further, the court instructed the jury that the publication of a libelous statement with respect to matters of public interest and general concern, even though the libelous statement is false, is privileged as a matter of law, unless the statement was published with malice. The court defined malice as either ill will or a reckless disregard of the truth. Illustrative of the alleged defamatory words are those found in the report set forth below.[2]
*732 The United States Supreme Court in 1964 handed down the landmark decision of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R. 2d 1412 (1964). Its interpretation of constitutional guarantees of protection or immunity for privileged or fair comment, through application of the First and Fourteenth Amendments to the Federal Constitution, will effect substantial modification in the jurisprudence affecting the law of defamation of the several states. Necessity for this change is indicated in the following pronouncement of the decision:
"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice'that is, with knowledge that it was false or with reckless disregard of whether it was false or not." [376 U.S. 254, 279, 84 S.Ct. 726]
New York Times was a suit by a public official of Montgomery, Alabama, who alleged he had been libeled by the New York Times through the advertisement of a civil rights group. Some of the statements in the advertisement claimed to be derogatory of the plaintiff were admittedly untrue and the newspaper had in its files information which showed them to be untrue. After an Alabama jury had awarded compensatory and punitive damages against the New York Times and certain individual defendants, the Supreme Court of the United States, on certiorari, reversed the Alabama judgment and held the defendants were entitled to judgment as a matter of law. The case deals with public officials only, not candidates for public office or public figures, and the alleged defamatory statements were related to the official conduct and not to the private life of the public official involved. Thus, the United States Supreme Court has laid down, as required by the constitutional guaranty of free speech and press, the rule that a statement attacking the official conduct of a public official does not forfeit the protection of the constitutional guaranty by the falsity of some of its factual statements and by its alleged defamation of the public official or by a combination of these two elements, and that a defense must be allowed for erroneous statements honestly made; in other words, the court has announced a federal rule, binding on state courts, which prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice. The court has further held (footnote 30 of opinion) that since the constitutional *733 guaranty requires recognition of the conditional privilege for honest misstatements of facts, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact, this defense also being defeasible if the public official proves actual malice. See 95 A.L.R.2d 1450, Anno.
Additional expression by the court was given to the doctrine in Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125; Moity v. Louisiana, 379 U.S. 201, 85 S.Ct. 323, 13 L.Ed.2d 339; Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892; and Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597. In each of those cases the challenged remarks were made about public officials or persons in public employment. As of this date we know of no action by the court extending the doctrine to other categories of complainants, such as public figures or people engaged in the discussion of matters of noteworthy public concern. The court, however, left open this question for future case by case determination as to who should be subject to the burden of proving "actual malice" under its standards. In Rosenblatt v. Baer, supra, through a footnote, the court made the comment:
"We are treating here only the element of public position, since that is all that has been argued and briefed. We intimate no view whatever whether there are other bases for applying the New York Times standardsfor example, that in a particular case the interests in reputation are relatively insubstantial, because the subject of discussion has thrust himself into the vortex of the discussion of a question of pressing public concern." [383 U.S. 75, 86, 86 S.Ct. 676]
The defense urges that the alleged libelous publications made were without malice and related to the public speech and conduct of the plaintiff, a person of admitted public prominence, who deliberately thrust himself into an area in which matters of profound significance and pressing public concern were at issue, and were protected from the claim of libel by the First Amendment to the Constitution of the United States, which the Fourteenth Amendment made applicable to the states.
The protection and immunity so claimed is a qualified or conditional privilege, the immunity gained therefrom being conditioned upon good motives and reasonable behavior. The immunity does extend to "fair" comment or criticism on matters of public interest or concern. "Public interest", however, does not confer upon a newspaper or anyone else the privilege of publishing defamation merely because it has "news value", and the public would like to read it. The privilege is limited to those matters which are of legitimate concern to the community as a whole because they materially affect the interest of all the community. The comment must be "fair" and directed and confined to the facts which are a matter of public concern, and not go beyond them by attacking the personal character of the individual involved. Prosser on Torts, 2nd Ed. pp. 606, 619 and 623.
In a recent decision of the Supreme Court in Matassa v. Bel, 246 La. 294, 164 So.2d 332 (1964) Chief Justice Fournet as the organ of the court made this observation:
"In order to avail oneself of the rule of fair comment and criticism the publication must be one made `with an honest purpose, without malice, based on facts, * * * restricted to a man's acts or works' and, in addition, it `must not attack him in his private character nor convey imputations of an evil sort except so far as the facts, truly stated, warrant the imputation.' And for the publication to enjoy a qualified privilege, the statement must be prepared bona fide, with the view to preventing or punishing some public abuse, in which case it is considered as justified as a duty owed to society, providing it does not `meet the objection of having been made maliciously and *734 without probable cause.' Madison v. Bolton 234 La. 997, 102 So.2d 433, and the extensive authorities therein cited.
"As was very aptly observed in that case, `while the great weight of authority supports the view that publications concerning political matters, public officers, and candidates for office are entitled to a measurable privilege by reason of the public interest involved, there are recognized limitations of the rule, foremost among these being that the statements must not be motivated by actual malice,' and, further, that `persons holding or aspiring" to public office are not wholly without the protection of the law, since it is generally held that accusations of dishonesty or corruption and imputations of dereliction of duty or misconduct in office are not privileged.'" [164 So.2d 332, 334]
A similar observation is found in Kennedy v. Item Company, 213 La. 347, 34 So.2d 886 (1948):
"But in securing to themselves this unqualified right, they never intended to place those exercising it wholly beyond the reach of the law and unaccountable for the abuse of the privilege. As was so aptly pointed out by Justice Kent of New York in the celebrated case of people v. Croswell, 3 Johns.Cas. 337, at page 393, decided in 1804, `The founders of our governments were too wise and too just, ever to have intended, by the freedom of the press, a right to circulate falsehood as well as truth, or that the press should be the lawful vehicle of malicious defamation, or an engine for evil and designing men, to cherish, for mischievous purposes, sedition, irreligion, and impurity. Such an abuse of the press would be incompatible with the existence and good order of civil society.' In this same opinion the organ of the court accepted as correct and accurate General Alexander Hamilton's definition `that liberty of the press consists in the right to publish, with impunity, truth, with good motives, and for justifiable ends, whether it respects government, magistracy, or individuals.' * * *" [34 So.2d 886, 889]
As stated by William H. Taft, J., later President and Chief Justice of the United States Supreme Court, in a leading case, Post Publishing Company v. Hallam, 59 F. 530 (C.C.A. 6th, 1893):
"* * * The existence and extent of privilege in communications are determined by balancing the needs and good of society against the right of an individual to enjoy a good reputation when he has done nothing which ought to injure it. The privilege should always cease where the sacrifice of the individual right becomes so great that the public good to be derived from it is outweighed. Where conditional privilege is extended to cover a statement of disgraceful fact to a master concerning a servant or one applying for service, the privilege covers a bona fide statement, on reasonable ground, to the master only, and the injury done to the servant's reputation is with the master only. This is the extent of the sacrifice which the rule compels the servant to suffer in what was thought to be, when the rule became law, a most important interest of society. But, if the privilege is to extend to cases like that at bar, then a man who offers himself as a candidate must submit uncomplainingly to the loss of his reputation, not with a single person or a small class of persons, but with every member of the public, whenever an untrue charge of disgraceful conduct is made against him, if only his accuser honestly believes the charge upon reasonable ground. We think that not only is such a sacrifice not required of everyone who consents to become a candidate for office, but that to sanction such a doctrine would do the public more harm than good. We are aware that public officers and candidates for public office are often corrupt, when it is impossible to make legal proof thereof, and of course it would be well if the *735 public could be given to know, in such a case what lies hidden by concealment and perjury form judicial investigation. But the danger that honorable and worthy men may be driven from politics and public service by allowing too great latitude in attacks upon their characters outweighs any benefit that might occasionally accrue to the public from charges of corruption that are true in fact, but are incapable of legal proof. * * *" [59 F. 530, 540]
The jurisprudence of this state and in a majority of jurisdictions, has consistently adhered to the rule that fair comment on and criticisms of the acts and conduct of a public officer or candidate for public office are, in the absence of malice, privileged, but the rule does not apply to a false statement of fact. In these jurisdictions defamatory statement of fact concerning one in public life, or who is a candidate for office, if false, is as actionable as would be such a statement concerning one in private life.[3] As further reflected in our jurisprudence, in actions for defamation, the courts have indulged in a prima facie presumption that defamations which are actionable, per se, are malicious. In New York Times, however, it was held that a presumption of malice where general damages in a libel action are concerned is inconsistent with the constitutional guarantee of freedom of press, which affords the defendant a qualified privilege of honest mistake.
Notwithstanding the criteria imposed by New York Times and its impact upon our jurisprudence, it was not the intent of the court to recognize absolute immunity from libelous statements. Thus Garrison v. State of Louisiana, supra, recognized the exception, declaring:
"The use of calculated falsehood, however, would put a different cast on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. Cf. Riesman, Democracy and Defamation: Fair Game and Fair Comment I, 42 Col.L.Rev. 1085, 1088-1111 (1942). That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which `are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality * * *' Chaplinsky v. [State of] New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031, [1035]. Hence the knowingly false statement and false statement made with reckless disregard of the truth, do not enjoy constitutional protection." [379 U.S. 64, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133] *736 Resolution of the instant case does not depend upon certain federal and state courts which have extended the New York Times rule to those persons other than public officials or persons in public employment, who thrust themselves "into the vortex of the discussion of a question of pressing public concern."[4] It is our position that plaintiff furnished satisfactory proof to the jury and to this court that the libelous statements were "made with `actual malice', * * * that is, with knowledge that it was false or with reckless disregard of whether it was false or not."
Counsel for appellee assert that the alleged libelous statements in the instant case were deliberately made by Van Savell in reporting that Walker committed crimes in assuming command of the mob and leading charges against United States Marshals; and that they were made with knowledge of their falsity or with reckless disregard of the truth.
It is significant that the words complained of related to actions and conduct which were represented as positive statements of fact personally observed. As so reported there can be no real basis for mistake or error honestly made therein. The statements were either false or true and knowingly represented as such. Forasmuch as falsity has been proven to the jury and to this court, we are impelled to the conclusion that the representations were made with knowledge of their falsity or with reckless disregard for the truth. We therefore find that the words were libelous, per se, and made with actual malice.
Appellants complain that the trial of the case denied to them due process of law, the right to a fair and impartial trial, and the protection of the Fourteenth Amendment to the United States Constitution, urging objection, first, that the remarks of plaintiff's counsel to the jury were improper and prejudicial, and second, that although appellants requested a special charge that punitive damages were not recoverable in Louisiana, the court nonetheless refused to give such instructions. The record discloses the trial judge gave the following instructions to the jury:
"You are to disregard any remarks of counsel which you find to be inconsistent with the evidence in the case or the law as charged you by the Court.
"The general law is that the reparation should be equal to the injury received, and that no one should be allowed to unjustly enrich himself at the expense of another.

* * * * * *
"If you should find that the plaintiff is entitled to a verdict in this case, you should allow such sums as will fairly and reasonably, in your best judgment, based on the evidence in the case, compensate him for the damages sustained; but only for items claimed in the petition and not to exceed the amounts as claimed * *."
In the presentation of the plaintiff's case to the jury, it is charged that his counsel demanded damages of $1,000 for each of the 1250 newpapers members of the Associated Press and that he further made inflammatory remarks, such as "These people need a lesson. You have got to teach them" and appealed to racial prejudice. Examination of the purported remarks to the jury in view of the charges given by the district judge, do not appear to us to be unduly prejudicial. However, appellants' contentions are without merit as this court is one in which the appeals are upon both the law and the facts. Article 7 § 28 Louisiana Constitution, 1921. We may and do correct any such irregularity. The *737 contention relating to punitive damages is likewise untenable by reason of proper instructions by the court and this court's Constitutional powers.
Further error is assigned to the district court's failure to sustain exceptions of improper cumulation of actions. The error is predicated upon the argument that:
"* * * plaintiff's demand includes claims or causes of action based on conduct, communications or publications alleged to have occurred and occurring outside of Caddo Parish, Louisiana, and for the recovery of damage alleged to have been sustained by the plaintiff outside of Caddo Parish, Louisiana, as to which the First Judicial District Court in and for Caddo Parish, Louisiana, is not a court of proper venue."
The exact issue has not been heretofore presented to this court, except as to some aspects of this question discussed in our previous decision in this case which determined the issue of venue. (La.App., 162 So.2d 437). Appellants' contention is based upon the proposition that there are multiple causes of action as opposed to a single cause of action with each court of separate jurisdiction having venue of the action for recovery of damage occurring within the court's jurisdiction. Under the single publication rule, there is but one cause of action occurring at the time of the first communication of libel and venue is proper only as to the location of the printing and beginning of distribution, the libel being complete at that point. Further circulation of the printed material containing the libel becomes a further incident as to the same libel or the same cause of action. Under our venue statute, C.C.P. Art. 74, as so interpreted in our prior decision, La. App., 162 So.2d 437, supra, venue is proper in any parish where the libel was circulated, due to an incident of wrongful conduct having occurred therein. When the issue of venue was passed upon by this court we ruled that once venue is established, the jurisdiction of the court extends to all damages caused by the wrongful conduct, even if such damages occurred in multiple instances and beyond the territorial jurisdiction of the court of proper venue. Although counsel for appellants refer to a comment appearing in 25 La.Law Review at pages 435 and 436[5] as supporting their argument, such comment merely seems to approve of the multiple action rule. We prefer to hold there is but a single action which means that only a part of the wrongful conduct has to occur within the court's jurisdiction in order to give it complete venue.
The Times-Picayune in further support of its argument on the exception of improper cumulation of actions, asserts that plaintiff is suing upon a separate cause of action against each of the defendants and that they are not solidarily liable and therefore they are not joint tort feasors. Cited as authority is the case of McGee v. Collins, 156 La. 291, 100 So. 430, 34 L.R.A. 336 (1924). This case is not authority for defendants' postulation. Questions of slander were involved therein and not libel, the court pointing out that the publication of a libel may be the joint act of two or more persons who may in such case be sued jointly or separately at the election of the plaintiff, whereas such is not true with respect to an action for slanderous words for the reason that the words of one person are not the words of others.
*738 An additional assignment of error attacks the constitutionality of LSA-C.C.P. Art.74 as applied in the trial court in this case as an unconstitutional abridgment of the rights of the defendants under the First and Fourteenth Amendments to the Constitution of the United States. It is argued that in its application herein Article 74, which provides that an action for the recovery of damages for an offense or quasi offense, may be brought in the parish where the wrongful conduct occurred, or in the parish where the damages were sustained, has a direct tendency to restrict or inhibit the dissemination and circulation of news information and intelligence, and that it gives a plaintiff in an action for an alleged libel the right to select as a forum for his suit any of the sixty-four parishes within the state to which the alleged libelous material may have been sent or received. It is further argued that such venue statutes have been held unconstitutional by courts of other states, that minimal circulation may be used to set venue, and that the codal article is discriminatory in that other tort feasors would not have the same privileges of multiple venues. This issue of unconstitutionality was presented to the Supreme Court of Louisiana and the Supreme Court of the United States. Upon the issue of venue, following our decision, writs of certiorari were requested of the Supreme Court of this state which were denied, 246 La. 374, 164 So.2d 360 (1964) and thereafter an appeal was made to the Supreme Court of the United States. That court treated appellants' application as one of certiorari and granted a motion to dismiss for want of jurisdiction. 379 U.S. 47, 85 S. Ct. 208, 13 L.Ed.2d 183, Reh. den., 379 U.S. 984, 85 S.Ct. 643, 13 L.Ed.2d 577.[6] Applicable to the instant case, we think, is C.C.P. Art. 463, which provides that parties plaintiff or defendant may be joined in the same suit if there is a community of interest between the parties joined and all of the actions cumulated are mutually consistent and employ the same form of procedure. These conditions are met in the present case. The defendants are clearly joint tort feasors and in our opinion the actions against each have been properly cumulated.
The defendant Times-Picayune relies on the case of Layne v. Tribune Company, 108 Fla. 177, 146 So. 234, 86 A.L.R. 466 (1933) for the principle that only nominal damages should be assessed against a publisher who relies on a responsible and reliable news agency and publishes such accounts without malice. It is conceded by the defendant that this rule has never been accepted by the courts of Louisiana, but it is argued that our courts have awarded damages against publishers only in nominal amounts and accordingly have adopted the spirit of the Layne case. As supporting the decision reference is made to Barnhill v. Times-Picayune, 171 La. 286, 131 So. 21 (1930). *739 That case involved a report indicating that the plaintiff had mistreated his wife in which the AP dispatch gave the incorrect name. The case turned upon the finding that plaintiff was not injured and he was awarded only $25.00. The court, however, made the following interesting comment:
"Necessarily, a publisher of a newspaper must collect news items through reporters and other agents. If a publisher is not held responsible for the fault or negligence of such agents in gathering news and sending in to the papers libelous reports, then recovery of damages in such cases could not be had, and the law of libel would become a dead letter in this state." [131 So. 21, 23]
As heretofore noted, the Associated Press is a member corporation of which the Times-Picayune is a member. Its bylaws describe it as:
"* * * a mutual and cooperative association formed to gather with economy and efficiency and accurate and impartial report of the news * * * and to furnish and supply the same to its members * * *."
It would thus seem clear to us that either a relationship of agency between the association and its members had been formed or that the principle of respondeat superior must be followed as provided in LSA-C.C. Art. 2320. It is admitted that Savell was in the employ of the Associated Press, and association which the Times-Picayune Publishing Corporation voluntarily joined, financially supported, and from which it profited by the labors of that association. As a member, a profiting member of the association, it should respond for the torts of the employees of the association.
The judgment of the trial court, responsive to the jury verdict, fixed damages in the sum of $2,250,000. Defendants contend, and rightly so we think, that this amount is excessive and should be revised. It must be recognized, of course, that puntive damages cannot be recovered in civil actions in Louisiana, including civil actions for libel. Petitioner's claim embraces actual or special damages of loss of future earning capacity of $250,000; other items comprehend damages to plaintiff's good name, fame and reputation of $1,000,000; damages resulting from mortification and humiliation in the amount of $500,000, and mental pain and anguish, $500,000. Except for the actual or special damages as above claimed, the other items fall within the class referred to as general damages. Petitioner has failed to prove actual or special damages as such. As a rule, where a publication is libelous, per se, charging as it does acts which would constitute criminal offenses, such charges are considered as justifying an inferential conclusion of damages subject to monetary compensation without the necessity for special proof. On the other hand, actual or special damages must be supported by factual proof. The Supreme Court, in its determination of quantum in the case of Kennedy v. Item Company, 213 La. 347, 34 So.2d 886 made this comment which we find apropos:
"* * * in fixing an amount we must, under the jurisprudence, take into consideration the severity of the charges, the motives of the publisher, as well as the position of influence enjoyed by the newspaper and the extent of its circulation. We must also take into consideration the fact that the plaintiff, in seeking vindication by peaceful and orderly means, has had to bear with his injured feelings during this long and protracted litigation * * * as well as the time, efforts, and expense expended by him in connection therewith. Besides, although it is as a practical matter almost an impossibility to envision the actual, both present and future, effect this editorial will have on the plaintiff's business and profession, we must consider this in our arrival at the proper amount of damages to award him, for it is well known that such matters have an uncanny way of coming to light through one *740 medium or another and confronting the victim in the future whenever he is being considered, whether in a business venture or in a matter of public or private importance. * * *"
"While it is true, as pointed out by the defendant, that nominal damages only are given in many cases, in these cases the court found that the publication was made in good faith, with good motives, for justifiable ends, and with no malice or ill will toward the victim. Where these things have not been found to be true, the awards have been much more than mere nominal damages. * * *" [34 So.2d 886, 895]
Counsel for the defendants has furnished a table of awards of damages in Louisiana defamation cases which reflect awards involving comparatively modest sums, varying from $1.00 to $9,500.00. To offset the implications therefrom, counsel for plaintiff have made reference to a number of cases from other jurisdictions reflecting awards of damages varying in amounts from $100,000 to $500,000. It does not seem to us that a review or discussion of those decisions will be helpful.
The background of the plaintiff, his achievements and success in life have already been recorded as has been the severity of the defamation. The circumstances require that the award be substantial. After weighing this matter and excluding from our findings punitive or exemplary damages as such, we fix the award in this case at the sum of Seventy-Five Thousand and No/100 Dollars ($75,000.00) with five percent (5%) per annum interest from the tenth (10th) day of September, 1963, until paid.
Accordingly, the judgment of the trial court is amended by reducing the award in favor of plaintiff from $2,250,000.00 to the sum above fixed, and as so amended, the judgment is affirmed.
Appellants are taxed with the costs of this appeal.
NOTES
[1] The Associated Press is a nonprofit membership corporation, organized under the laws of the state of New York. It is engaged in gathering and distributing news to its membership, which includes newspapers and radio and television broadcasting stations throughout the United States. The Times Picayune Publishing Corporation is the publisher of the New Orleans Times-Picayune and the New Orleans States-Item, daily newspapers of general circulation in the city of New Orleans and in the vicinity thereof. These newspapers are members of the Associated Press.
[2] "By Van Savell

Oxford, Miss., Oct. 3 (AP)Utilizing my youth to the fullest extent, I dressed as any college student would and easily milled among several thousand rioters on the University of Mississippi campus Sunday night.
"This allowed me to follow the crowda few students and many outsidersas they charged federal marshals surrounding the century-old Lyceum Building. It also brought me into direct contact with former Army Maj. Gen. Edwin A. Walker, who is now under arrest on charges of inciting insurrection and seditious conspiracy.
"Walker first appeared in the riot area at 8:45 P.M. Sunday near the University Avenue entrance about 300 yards from the Ole Miss Administration Building.
"He was nattily dressed in a black suit, tie and shoes and wore a light tan hat.
"The crowd welcomed Walker, although this was the man who commanded the 101st Airborne Battalion during the 1957 school integration riots at Little Rock, Ark. One unidentified man queried Walker as he approached the group.
`General, will you lead us to the steps?'
"I observed Walker as he loosened his tie and shirt and nodded `Yes' without speaking. He then conferred with a group of about 15 persons who appeared to be the riot leaders.
"The crowd took full advantage of nearby construction work. They broke new bricks into several pieces, took survey sticks and broke soft drink bottles.
"Walker assumed command of the crowd, which I estimated at 1,000, but was delayed for several minutes when a neatly dressed, portly man of about 45 approached the group. He conferred with Walker for several minutes and then joined a group near the front.
"Two men took Walker by the arms and they headed for the Lyceum and the federal marshals. Throughout this time, I was less than six feet from Walker.
"This march toward tear gas and some 200 marshals was more effective than the previous attempts. Although Walker was unarmed, the crowd said this was the moral support they needed.
"We were met with a heavy barrage of tear gas about 75 yards from the Lyceum steps and went a few feet further when he had to turn back.
"Before doing so, many of the rioters hurled their weaponsthe bricks, the bottles, rocks and wooden stakestoward the clustered marshals.
"We fled the tear gas and the charging marshalsthe crowd racing back to a confederate soldier's statute near the Grove entrance below the Lyceum.
"I went to a telephone. A few minutes later I returned and found Walker talking with several students. Shortly thereafter, Walker climbed halfway up the Confederate Monument and addressed the crowd.
"I heard Walker say that Gov. Ross Barnett had betrayed the people of Mississippi.
`But don't let up now,' he said. `You may lose this battle but you will have been heard.'
"He continued:
`This is a dangerous situation. You must be prepared for possible death.
If you are not, go home now.'
"There were cheers. It was apparent that Walker had complete command over the group.
"By this time, it was nearly 11 P.M. and I raced to the telephone again. Upon my return, Walker was calmly explaining the `new frontier' Government to several bystanders. He remained away from the rioting throughout the next few hours, but advised on several tactics.
"One Ole Miss student queried the former General, `What can we use to make the tear gas bomb ineffective? Do you know of any way that we cannot attack and do some damage to those damn marshals?'
"Walker suggested the use of sand to snuff out the tear gas. `This stuff works real well, but where can you get it?' He asked.
"At this time the rioters were using a University fire truck and five portable fire extinguishers in an attempt to make the tear gas bombs ineffective.
"I left Walker and walked about 100 yards away where Molotov Cocktailsgasoline in bottles with a fusewere being made.
"Again I left the area for a telephone. As I walked toward a dormitory with George Bartsch of the Little Rock Associated Press Bureau, we were attacked by marshals who mistook us for students. We were deluged by tear gas, manhandled, handcuffed and beaten with clubs during a 200-yard walk back to the Lyceum Building.
"Thanks to recognition from Chief Marshal James P. McShane, we were quickly released and given freedom in the marshals' headquarters.
"Within minutes rifle and shotgun fire erupted from the rioting crowd and two menone a French newsmanwere killed. We considered ourselves lucky to have been arrested and glad to be behind closed, heavily guarded doors."
[The New Orleans States-Item, October 3, 1962]
[3] Levert v. Daily States Pub. Co., 123 La. 594, 49 So. 206, 23 L.R.A., N.S., 726, 131 Am.St.Rep. 356 (1909); Smith v. Lyons, 142 La. 975, 77 So. 896, L.R.A. 1918E, 1 (1917); Otero v. Ewing, 162 La. 453, 110 So. 648, 56 A.L.R. 249 (1926) (later appeal in (1927), 165 La. 398, 115 So. 633); Edwards v. Derrick, 193 La. 331, 190 So. 571 (1939); Cadro v. Plaquemines Gazette, 202 La. 1, 11 So.2d 10 (1942); Martin v. Markley, 202 La. 291, 11 So.2d 593 (1942).
[4] Some of the federal and state courts have extended the principle of New York Times to private individuals involved in public controversy, others have not done so. The factual situation in each individual case has an important bearing on the application of the rule. See discussion of authorities in Pauling v. Globe-Democrat Publishing Company, 362 F. 2d 188 (8 Cir. 1966).
[5] "The appellate court upheld the venue as to the Associated Press on the ground that `An action against joint or solidary obligors may be brought in any parish where such action may be maintained against either.' 162 So.2d at 440. This is much too broadly stated. The pertinent code provision reads: `An action against joint or solidary obligors may be brought in any parish of proper venue, under article 42, as to any obligor who is made a defendant.' La.Code of Civil Procedure art. 73 (1960). However, this is of no moment here, as the venue was proper as to Associated since the damages caused by its wrongful act were sustained in Caddo Parish. * * *."
[6] Appellants presented therein the following questions:

"(1) Whether Article 74 of the Louisiana Code of Civil Procedure, as interpreted, construed and applied by the Court of Appeal, Second Circuit, State of Louisiana, constitutes an unwarranted interference with Appellants' rights of free speech and freedom of the press and imposes an undue and unnecessary burden on Appellants in the exercise of their rights of free speech and freedom of the press under the First and Fourteenth Amendments to the Constitution of the United States?
"(2) Whether Article 74 of the Louisiana Code of Civil Procedure, as interpreted, construed and applied by the Court of Appeal, Second Circuit, State of Louisiana, deprives Appellants of their rights to equal protection of the law and due process of law under Section 1 of the Fourteenth Amendment to the Constitution of the United States by:
"(a) Giving a plaintiff seeking damages for libel in a case of this type privileges of venue not allowed by law to a plaintiff in actions for the recovery of damages for torts generally and subjecting Appellants to more onerous venue provisions than are applied to other defendants in tort actions generally;
and
"(b) Subjecting Appellants to a multiplicity of actions for what is practically and essentially a single alleged tort?"