355 So.2d 879 (1977)
Donald James MASHBURN, d/b/a Maison de Mashburn
v.
Richard H. COLLIN et al.
No. 59466.
Supreme Court of Louisiana.
December 13, 1977.
*881 Garic K. Barranger, Barranger, Barranger, Jones & Fussell, Covington, Mack Barham, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, for defendant-applicant.
Carl W. Cleveland, Henican, James & Cleveland, New Orleans, for plaintiff-respondent.
DENNIS, Justice.
"T'aint Creole, t'aint Cajun, t'aint French, t'aint country American, t'aint good." So began a critique of the cuisine served at Maison de Mashburn, a restaurant near Hammond, which appeared in the "Underground Gourmet" column of the June 22, 1974 New Orleans States-Item newspaper. Shortly after the article was published Donald J. Mashburn, owner and operator of Maison de Mashburn, filed a defamation suit against the column's author, Richard H. Collin, and the publisher, Times-Picayune Publishing Corporation, seeking $2,000,000 in damages for humiliation, injury to professional reputation and loss of business allegedly caused by the publication. The claim against the Times-Picayune Publishing Corporation was subsequently dismissed following an out of court settlement.
Defendant Richard Collin filed a motion for summary judgment, asserting that the criticism complained of was privileged as "fair comment." The trial court found that there was no genuine issue as to the fact that the defamatory statements had been made without "actual malice," that is, without knowledge of their falsity and without reckless disregard for whether they were false, and granted the motion for summary judgment.
The First Circuit Court of Appeal held that, on the record established by the pleadings, affidavit, and deposition on file, see, Louisiana Code of Civil Procedure Article 966, the issue of whether the statements were made with knowing or reckless falsity was not material because Mashburn was a "private" plaintiff, not a "public figure," who therefore, under the applicable principles of law, Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), needed only to show "fault" to recover damages for defamatory falsehoods. Since the question of Collin's "fault," as opposed to "malice," in publishing the statements, does present a genuine issue as to a material fact, the court of appeal reversed the summary judgment and remanded for further proceedings. 341 So.2d 1236 (La.App. 1st Cir. 1977). We granted certiorari to determine what protection, if any, the common law privilege of "fair comment," which has been given a federal constitutional dimension by the Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny, affords to the libelous statements of a restaurant critic. 343 So.2d 1074 (La.1977).
Before 1925, the Supreme Court did not intimate that the First Amendment was applicable to the states by reason of the *882 Fourteenth Amendment,[1] and a definite decision to this effect did not occur until six years later.[2] Even after this development, the high court consistently refused to extend constitutional protection to libelous statements under the guarantees of freedom of speech and freedom of press.[3] It was not until 1964 that the Supreme Court, in New York Times v. Sullivan, supra, declared that the common law defense of truth, standing alone, was insufficient to protect freedom of expression, and erected a constitutional privilege for fair comment respecting public officials. The Court held that the First Amendment guarantees prohibit a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not.[4]
Under the common law rules of defamation, which the Supreme Court used as models in shaping the constitutional privilege of New York Times, a publisher was strictly liable for publication of defamatory statements unless he could prove that the statements were either true or privileged. One of the most important privileges recognized at common law was the privilege of "fair comment." This was a qualified privilege to express an opinion or otherwise comment on matters of public interest.[5] Traditionally, fair comment concerned persons, institutions or groups who voluntarily injected themselves into the public scene or affected the community's welfare, such as public officials, political candidates, community leaders from the private sector or private enterprises which affected public welfare, persons taking a public position on a matter of public concern, and those who offered their creations for public approval such as artists, performers and athletes.[6] While the existence of the privilege was undisputed, a large majority of state courts held that only "comment" or opinion was protected and not misstatements of fact.[7] There was, however, a substantial, and vigorous, minority view that even false statements of fact were privileged, if they were made for the public benefit with an honest belief in their truth.[8]
In fashioning the New York Times First Amendment privilege, the Supreme Court borrowed the minority common law fair comment view, elevated it to constitutional status, and limited its use to good faith criticism of public officials.[9] Following New York Times, the Court in a series of decisions clarified and expanded the new constitutional privilege.[10] The designation of "public officials" was expanded to include relatively low-ranking government employees including "at the very least . . . those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or *883 control over the conduct of governmental affairs."[11] Protection was afforded a broad range of comments about public officials, including, for example, "a charge of criminal conduct, no matter how remote in time or place." [12] The ambit of the privilege was enlarged to include comments about "public figures" requiring them to prove knowing or reckless falsity before recovering for defamatory statements made respecting their public involvement.[13] "Actual malice," for purposes of the New York Times constitutional privilege, does not mean either "malice" or "recklessness" as defined at common law, but "knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not."[14] A showing of common law "actual malice" is not sufficient to meet the Times standard.[15] In St. Amant v. Thompson, the Court declared:
"`Reckless disregard' . . . cannot be fully encompassed in one infallible definition . . . [however, the] cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."[16]
A plurality of the Supreme Court in Rosenbloom v. Metromedia[17] would have extended the constitutional privilege to "all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous."[18] Under this extension, private individuals, like public officials and public figures, would have had to prove knowing or reckless falsity where the defamatory statement concerned matters of public or general concern.
The Rosenbloom plurality view, however, was short-lived. A shift in position by one member of the Court and the replacement of two others resulted in a new majority in Gertz v. Robert Welch, Inc.,[19] which approved New York Times and Butts, retreated from the Rosenbloom extension, and drastically revised the constitutional privilege, along with a great deal of the states' traditional defamation law.[20] The Court held that (1) public officials and public figures may recover for defamation only upon clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard of the truth;[21] (2) the states may define the standard of liability for a publisher of defamatory falsehood injurious to a private individual (at least where the defamatory potential of the material is apparent on its face) so long as they do not impose liability without fault;[22] and, (3) presumed and punitive damages may be recovered only by establishing with clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or reckless disregard *884 for the truth.[23] Thus, the Gertz court, in a radical reinterpretation of the First Amendment, retreated from the position taken in Rosenbloom in some respects, but in others it made "more sweeping incursions" into the common law.[24] For our purposes in the instant case it is important to note that, whatever the restrictions imposed in other areas, Gertz actually broadened the class of defendants protected under the privileges by extending it to include those accused of defaming "private" plaintiffs.
These cases in which the Supreme Court has struggled to reconcile First Amendment freedoms and the law of defamation have involved misstatements of facts. Nevertheless, the decisions have had a correlative effect upon the power of the states to impose liability for defamatory opinions. The Court specifically stated in New York Times that since the First Amendment, which is applicable to the states through the Fourteenth Amendment, "requires recognition of the conditional privilege for honest misstatements of fact, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact."[25] In the Gertz decision it is strongly indicated that the Court, in relaxing the stringent test of the New York Times rule in cases brought by private individuals, was speaking in terms only of libelous misstatements of fact and that mere comment or opinion on public matters, even though defamatory, enjoys the unqualified protection of the First Amendment.[26] The Court contradistinguished defamatory opinions and defamatory misstatements of fact a as follows:
"We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in `uninhibited, robust, and wideopen' debate on public issues." 418 U.S. at 339-40, 94 S.Ct. at 3007, 41 L.Ed.2d at 805.
In Letter Carriers v. Austin, decided the same day as Gertz, the Court flatly stated that "[b]efore the test of reckless or knowing falsity can be met, there must be a false statement of fact," and refused to apply the test to what a majority of the Court found to be a mere expression of opinion.[27] The logical inference to be drawn from the language and the Court's analysis in these cases is that mere opinion expressed on matters of public concern cannot be the basis of a defamation action.[28] If "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters," then surely the First Amendment must also protect the expression of opinion in order to foster "uninhibited, robust and wide-open" debate on public issues.[29] Indeed, the constitutional safeguard "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."[30] However, in New York Times *885 the Court indicated that defenses which protect both misstatements of fact and expressions of opinion are defeasible if the plaintiff proves "actual malice," which was defined by the Court as knowing or reckless disregard of the truth.[31]
We conclude, therefore, that the First Amendment freedoms as defined by the New York Times-Gertz series of decisions afford, at the very least, a defense against defamation actions for expressions of opinion about matters of public concern made without knowing or reckless falsity. Thus the Supreme Court appears to have drawn an important distinction between statements of fact and expressions of opinion in molding the constitutional privilege. While the states are free to impose liability for misstatements of fact about private individuals made with fault, they may impose liability for expressions of defamatory opinions about matters of public concern only when made with knowing or reckless falsity. The contours of the New York Times-Gertz privilege regarding expressions of opinion are uncertain but we think that it clearly protects at least (1) mere expressions of opinion; (2) by members of the press or the news media;[32] (3) concerning matters of public interest or concern; (4) when made without knowing or reckless falsity.
The distinction drawn between opinion and statement of fact has long been important at common law because most states restricted the privilege of fair comment to expressions of opinion.[33] Although difficult to state in abstract terms, as a practical matter, the crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact.[34] The opinion may be ostensibly in the form of a factual statement if it is clear from the context that the maker did not intend to assert another objective fact but only his personal comment on the facts which he had stated.[35] An expression of opinion occurs when the maker of the comment states the facts on which his opinion of the plaintiff is based and then expresses a comment as to the plaintiff's conduct, qualifications or character;[36] or when both parties to the communication know the facts or assume their existence and the comment is clearly based on the known or assumed facts in order to justify the comment.[37] Criticism is privileged as fair comment only when the facts on which it is based are truly stated or privileged or otherwise known either because the facts are common knowledge or readily accessible.[38]
In determining whether an expression is a statement of fact or opinion under the common law, words must be read in their context. Words which, taken by themselves, would appear to be a positive allegation of fact, may be shown by the context to be a mere expression of opinion or argumentative influence.[39] On the other hand, if a statement, ostensibly in the form of an opinion, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication, the expression gives rise to the *886 inference there are undisclosed facts that justify the opinion.[40] In such a case the expression, although in the form of an opinion, in reality implies a statement of fact, which is not usually protected by the common law privilege. In order for a statement to be defended as fair comment it must be recognizable by the ordinary reasonable person as opinion and not as a statement of fact.[41]
Although we have discovered no Louisiana cases involving food or restaurant critics, there are ample precedents recognizing the defense of "fair comment" in defamation suits.[42] Since we find that the publication in the instant case is fully protected by the principles enunciated in New York Times and Gertz, however, it is not necessary that we consider at this time whether our jurisprudential fair comment privilege and the freedom of expression guarantees of our state constitution also provide defenses for the criticism.[43]
The First Amendment requires careful appellate review of the facts found at trial or determined for purposes of summary judgment. The Supreme Court stressed this judicial obligation in New York Times Co. v. Sullivan, supra:
"* * * This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across `the line between speech unconditionally guaranteed and speech which may legitimately be regulated.' * * * In cases where that line must be drawn, the rule is that we `examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' * * * We must `make an independent examination of the whole record,' * * * so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.26 (Citations omitted).
26 "The Seventh Amendment does not, as respondent contends, preclude such an examination by this Court. That amendment, providing that `no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law,' is applicable to state cases coming here. * * * But its ban on re-examination of facts does not preclude us from determining whether governing rules of federal law have been properly applied to the facts. * * *." (Citations omitted).
376 U.S. at 285, 84 S.Ct. at 728, 11 L.Ed.2d at 709-10.
It is true that, as a general rule, a Louisiana appellate court should not disturb the reasonable findings and inferences of fact of a trial judge or jury, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Canter v. Koehring Company, 283 So.2d 716 *887 (La.1973). But when interpretation of a communication in the light of the constitutional requirements is involved, our scope of review is to examine in depth the "statements in issue" and the "circumstances under which they were made," see, New York Times Co. v. Sullivan, supra, 376 U.S. at 285, n. 26, 84 S.Ct. at 728, 11 L.Ed.2d at 709; Buckley v. Littell, 539 F.2d 882 (2d Cir. 1976); Davis v. Schuchat, 166 U.S.App.D.C. 351, 354-55, 510 F.2d 731, 735-36 (1975); Goldwater v. Ginsburg, 414 F.2d 324 (2d Cir. 1969), cert. denied 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970), and to "re-examine the evidentiary basis" of the lower court decision in the light of the Constitution. Time, Inc. v. Pape, 401 U.S. 279, 284, 91 S.Ct. 633, 636, 28 L.Ed.2d 45, 50 (1971).
In order to consider within their context the words which plaintiff contends were libelous, we set forth below the pertinent portion of the June 22, 1974 "Underground Gourmet" column with the statements complained of in italics.[44]
"MAISON DE MASHBURN, Country Club Rd. U.S. 190, Hammond, La. Closed Monday. Dinner 5-11 p. m. Sunday from noon. Reservations. Tel. X-XXX-XXXX. Bar.

"T'aint Creole, t'aint Cajun, t'aint French, t'aint country American, t'aint good. There's been a lot of fuss about this handsome new restaurant on the Covington-Hammond Rd. and more than the usual amount of letters telling me to try it. Mashburn's is an impressively setout restaurant located on a large and beautiful estate, in a fine 1907 house, with all of the amenities of a good European country inn.
"I don't know how much real talent in cooking is hidden under the melange of hideous sauces which make this food and the menu a travesty of pretentious amateurism but I find it all quite depressing. The line between genius and eccentricity is sometimes a thin one but at Mashburn's it is not really in doubt for very long. The only grand dish served here that I found acceptable was a good oysters Rockefeller (recommended). The oysters Bienville were a ghastly concoction combining all manners of strange flavors that are too weird even for this grand variable of the Creole cuisine. The stylesuch as it isof this restaurant is best demonstrated early in the meal by the escargots Bourgoghe. Mashburn's is not happy with the classic dish; snails in their shells in a rich garlic butter sauce. Here the snails are placed on mushrooms and served in a ramekin with butter sauce. Not bad as an idea providing the butter sauce is at least as good as that of the classic dish being `improved.' It decidedly is not.
"This is where the breaking point comes between marvelous originality and bizarre improvisationto know where to stop, which effect to make and simply what tastes good and what doesn't. Escargots a la Mashburn are simply pretentious failures that leave a bad taste in one's mouth.

"The fussiness with classic snails reflect this restaurant's strange image of itself, perhaps that of the only world purveyor of Hammond French food, although having eaten in some good places in Hammond I cannot honestly blame the taste shown by Mashburn's on this little town. A good example is a dish that is done extremely well in Creole and Cajun cooking as well as in French haute and country cooking, roast duck. I know several fine ways to eat duck and have no great urge to improve upon the classic styles.
"Mashburn's does. Put a yellow flour sauce on top of the duck, flame it for drama and serve it with some horrible multi-flavored rice in hollowed-out fruit and what have you got? A well-cooked duck with an ugly sauce that tastes too sweet and thick and makes you want to scrape off the glop to eat the plain duck. This is not an improvementit is a travesty of taste.

*888 "A real tour de force here is the stuffed eggplant maison de Mashburn. Not stuffed eggplant the way Galatoires' does it nor the kind served all over the city in little workingmen's restaurants. No, at Mashburn's it's different. Served in a casserole with minutely chopped particles of all manner of seafood (not good, not that bad), the piece de resistance that turns this into a gourmet dish is to empty a shaker full (more or less) of paprika on top of it. Voila! Now the casserole looks and tastes just like bad overcooked broiled fish. And just try scraping paprika off a casserole.
"I don't know if all of this is Mr. Mashburn's taste or if he is somehow convinced that opening an elaborate restaurant means that one has to cover everything with a GOURMET sauce. Most of the food tastes as if the conceptions were wrong to begin withas if someone flipped through pages of bad cookbooks looking for unusual sauces to make an ordinary dish impressive. Some of the basic cooking is good as with the duck or the simple and excellent French-fried potatoes. Or with the poached trout under a crawfish sauce that I would have named trout a la green plague. The trout was fine; a perfectly poached trout is a rare enough thing and I would have been impressed with it. The ugly green sauce had the same effect as putting mushrooms with snails, Paprika on eggplant or yellow death on duck.

"Only the proprietor of this new place can answer the question of whose taste is on the restaurant's menu. If it is his, then this restaurant is an irremedially ghastly mistake; if he really likes the nice plain food hidden beneath those sorry sauces than [sic] he should save us all the trouble of scraping them off by serving good honest plain food the way classic French and classic Creole restaurants do.
"Entres [sic] run from $4.75 for stuffed eggplant to $8.50 for prime beef, appetizers are $1.50 to $2.25 and desserts run from 75 cents to $1.50. Other grand entrees include Turkey `Cardon Bleu' (sic) chicken supreme, crabmeat au gratin, trout menuire or amandine and seafood medley Florentine.
"The chef's puffed-baked potato in which the insides are baked, combined with bacon and sour cream etc. are as good as they are at any country club or hotel banquet, which is to say gloopy; the caramel custard tastes like a fallen butterscotch flan which is not that bad but hardly like caramel custard.
"The coffee is good, the wine list adequate and sensible, the service perhaps a bit too fussy but basically good. The restaurant as it stands now is a burlesque."

The twenty some odd statements complained of within the "Underground Gourmet" column may be separated into three groups for the purpose of analysis.[45] First, many of the expressions are evaluations of a purely subjective nature. For example, Collin said that the food "[t]'aint Creole, t'aint Cajun, t'aint French, t'aint country American, t'aint good;" that "the menu [was] a travesty of pretentious amateurism;" that one dish served was a "bizarre improvisation" and a "pretentious failure. . .;" that the restaurant was eccentric, had a "strange image of itself," and was "a burlesque." It is clear from a reading of the whole column that these expressions of opinion are based upon facts stated within the publication, and that they do not give rise to inferences that there are other, undisclosed facts which justify the statements. Accordingly, the statements must be designated as comment or opinion, rather than statements of fact. Second, there are a number of statements describing the taste and the appearance of the restaurant's food. According to the author, the sauces could be described as "hideous" and "glop," the Oysters Bienville were a "ghastly *889 concoction" of "strange," and "weird" flavors, the escargots left "a bad taste in one's mouth," the duck was served with "horrible multiflavored rice," the stuffed eggplant looked and tasted like "bad overcooked broiled fish," and most of the food tasted "as if the conceptions were wrong to begin with," or as if the sauces came from "bad cook books." Although these remarks were sharply critical, they undoubtedly amounted to no more than expression of an opinion that the preparation of the food was ill conceived and unskillful. When read in their context, the words could not, as plaintiff contends, cause ordinary reasonable persons to conclude that there were facts suggesting unsanitary conditions not disclosed in the column which provided the basis for the author's opinion. Third, some of the statements, if taken by themselves, would appear to be allegations of fact, but may be shown by the context to be mere expressions of opinion. In mock praise of the stuffed eggplant, the critic said that "the piece de resistance that turns this into a gourmet dish is to empty a shaker full (more or less) of paprika on top of it." The tenor and context of this remark unmistakably indicate that it is an example of hyperbole which meant merely that in the critic's opinion a large amount of paprika unnecessarily had been added to the dish.[46] In similar fashion, when the author speaks of "trout a la green plague" and "yellow death on duck" it is obvious that an ordinarily reasonable person would not infer that these entrees were actually carriers of communicable diseases. Instead, a reading in context readily signifies that the writer was repeating his earlier criticism of the sauces which he thought unfavorably altered the appearance and taste of the food. In the final analysis, when we read the entire piece of criticism to determine how ordinary reasonable persons hearing or reading the statements would be likely to understand them, we find that they would be regarded as expressions of the writer's opinion, and not as statements of fact. Moreover, they do not reasonably give rise to the inference that there are undisclosed defamatory facts which justify the opinion; and the plaintiff does not contend that any of the column's expressions that we find are statements of fact were false, e. g., he does not argue in this Court that Collin did not actually visit the restaurant or taste the dishes described.
The evidence on the motion for summary judgment shows that Collin has been writing the "Underground Gourmet" column for many years. He has also written two editions of the "New Orleans Underground Gourmet," a book of restaurant critiques published by Simon & Schuster of New York, of which 140,000 copies have been sold publicly. Collin filed his own deposition indicating that he had reviewed hundreds of restaurants in the New Orleans area, that he followed his usual procedure in visiting and evaluating Maison de Mashburn, and that, while he attempted to use vivid, colorful language in the column, the review nevertheless expressed his careful, honest opinion and reflected no ill will or desire to harm the restaurant or its owners. In opposition Mashburn filed his own affidavit which neither related to the information contained in the column nor contradicted Collin's deposition. Instead, it merely sought to establish that Donald J. Mashburn was neither a public official nor a public figure as defined by the New York Times series of cases.
It is undisputed that the Maison de Mashburn is a public restaurant, actively engaged in advertising and seeking commercial patronage. Thus the establishment was a matter of public interest and properly a subject of fair comment under the common law and the constitutional privilege.[47] We think it equally clear that Collin, as a writer of a regular newspaper column, qualifies as a member of the press or the news media, regardless of how ill-defined that *890 term may be or whether the New York Times-Gertz privilege is to be restricted to such persons.[48] Therefore, since we have also concluded that the writings complained of were expressions of opinion rather than statements of fact, they were privileged unless published with knowing or reckless falsity. It is upon this last issue that plaintiff has concentrated his effort to defeat finally the motion for a summary judgment filed by the defendant.
A motion for summary judgment should be granted where it is shown that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.[49] The party moving for summary judgment has the burden of showing the absence of a genuine issue as to any material fact.[50] And where the trial court is presented with a choice of reasonable inferences to be drawn from the subsidiary facts contained in the affidavits, attached exhibits and depositions, the reasonable inferences must be viewed in the light most favorable to the party opposing the motion.[51] However, when a motion for summary judgment is made and supported, the adverse party cannot rest on the allegations of his pleadings, but must set out in evidence or depositions, "specific facts showing that there is genuine issue for trial."[52] Moreover, if the New York Times standards may be invoked in a case, the courts must apply them in assessing the summary procedure evidence. Accordingly, in order for a genuine issue to exist concerning the material fact of defendant's state of mind in making the alleged defamatory expression of fact or opinion, the plaintiff-opponent must show that a judge or jury reasonably could find by clear and convincing evidence that the expression of fact or opinion was made with knowing or reckless falsity.[53] Also, if there is no genuine issue of material fact, the plaintiff-opponent must show that a judge or jury reasonably could find by clear and convincing evidence, after construing all of the facts and inferences reasonably to be drawn therefrom in favor of the plaintiff-opponent, that the alleged defamatory statement was made with knowing or reckless falsity.[54] When reasonable minds must conclude that there is no genuine issue of material fact for trial and that the defendant-mover is entitled to judgment on the facts before the court, the motion for summary judgment should be granted.[55]
In cases affecting the exercise of First Amendment liberties, proper summary judgment practice is essential. As the Court in Washington Post Company v. Keogh[56] observed:
"* * * [T]he stake here, if harassment succeeds, is free debate. One of the purposes of the Times principle, in addition to protecting persons from being cast in damages in libel suits filed by public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government.. . . Unless persons, including *891 newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. * * *"[57]
Summary adjudication may be thought of as a useful procedural tool and an effective screening device for avoiding the unnecessary harassment of defendants by unmeritorious actions which threaten the free exercise of rights of speech and press.[58]
The affidavit filed by Mashburn fails to raise a material issue of fact. It is based upon the same misapprehension as the court of appeal opinion, viz., that Collin must show that Mashburn is a "public figure" in order to claim the First Amendment privilege. Since the defendant's derogatory expressions concerning the restaurant consisted solely of journalistic opinions about a matter of public interest, they were privileged unless uttered with knowing or reckless falsity. The affidavit is devoted solely to the question of whether Mashburn was a "public figure," an issue which is not material under the facts before the Court for purposes of the motion for a summary judgment. In contrast, Collin's deposition does establish satisfactorily the absence of knowing or reckless falsity on his part. Further, the reasonable inferences favorable to Mashburn which may be drawn from the facts before the Court do not show that a reasonable trier of fact could find by clear and convincing evidence that plaintiff has been defamed with knowing or reckless falsity by defendant.
Accordingly, we conclude that the trial judge was correct in granting summary judgment for the defendant in this case. There is no genuine dispute as to a material issue of fact and upon the facts before the Court the mover is entitled to judgment.
In order to avoid confusion in this evolving area of law, it is desirable that we state clearly some of the issues which have not been decided. Since the Supreme Court decisions from New York Times through Gertz and Firestone establish only minimum safeguards for the freedom of speech and the freedom of press under the First Amendment, it is permissible and perhaps appropriate for a state to grant broader protection of these important rights under its own constitution or laws. Because an expression of opinion without knowing or reckless falsity about a matter of public concern by the press is fully protected under the First Amendment aegis, we did not consider to what extent our state constitution, jurisprudence and statutes also protect expression of such opinions. Nor did we attempt to define the ambit of Louisiana's safeguard for defamatory misstatements of fact. Since the decision in Gertz many states have applied its negligence standard of liability in defamation actions based on misstatements of fact brought by private persons,[59] while some have followed the Rosenbloom rationale, applying an actual malice or gross negligence standard of liability in actions based on defamatory misstatements of fact brought by private individuals involved in matters of general or public interest.[60] It is clear that a state is free to *892 adopt any reasonable standard, so long as it affords the minimum protection required by the New York Times-Gertz cases.[61] In the instant case it was not necessary for us to define such a standard for Louisiana because we found the expressions in question to be opinions fully protected by the minimum federal standards.
The judgment of the court of appeal is reversed and the judgment of the trial court is reinstated. The costs of all proceedings in this Court are assessed to the respondent.
SUMMERS, J., dissents and will assign reasons.
SUMMERS, Justice (dissenting).
The majority's analysis of how ordinary reasonable persons reading the column would be likely to understand it is a cavalier disregard of the full context and substance of the published text. The impression I gain from a reading is that the author is stating the facts concerning the food at Mashburn's, and I believe that "reasonable" persons would come to a like conclusion. No food could reach the depths of degradation heaped upon Mashburn's menu by this column.
Mashburn's restaurant represents a conscientious undertaking by a private individual in a harmless enterprise. It has no broad impact upon the public in what the author characterizes as the restaurant's effect upon a "little town". Why the author would employ the power of the press and embark upon such a vicious and sustained attack defaming and maligning virtually all of Mashburn's culinary efforts is unexplained. One thing is certain. The composition on its face is undoubtedly designed to strike at the very heart of Mashburn's business causing him injury, untold humiliation and embarrassment.
In my opinion the tenor of this publication offends any ordinary standard of decency and fair comment. It constitutes a degrading, malicious and unprovoked attack which no privilege or right should condone.
In all matters involving rights and privileges there are corresponding obligations and responsibilities. In my view this publication demonstrates a total lack of restraint in the use of the awesome power of the press against a small private business man engaged in an honest and conscientious effort to earn a livingan enterprise with a very limited effect upon the public interest. Just as Mashburn is not a public official subject to almost unrestrained criticism, the author of this column is not entitled to any special license or privilege not enjoyed by other private individuals.
I would remand the case to the trial court to be tried by a jury.
NOTES
[1] Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).
[2] Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).
[3] E. g., Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952); Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (dictum); Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (dictum).
[4] 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
[5] 1 Hanson, Libel & Related Torts, § 137, p. 103 (1969).
[6] Id. § 138, p. 104; Gatley on Libel and Slander, § 107 (6th ed. 1967); Restatement of Torts 2d, § 566 (1977).
[7] W. Prosser, Torts, § 188, p. 819 (4th ed. 1971); Gatley, § 706 (7th ed. 1974); but see, Harper & James, The Law of Torts, § 5.28 (1956).
[8] Coleman v. MacLennan, 28 Kan. 711, 98 P. 281 (1908); Prosser, § 118, p. 820; Noel, Defamation of Public Officers and Candidates, 49 Cal.L.Rev. 875 (1949).
[9] J. Eaton, The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer, 61 Va.L.Rev. 1349, 1366 (1975).
[10] See, Robertson, Defamation and the First Amendment, 54 Tex.L.Rev. 199, 201-212 (1976).
[11] Rosenblatt v. Baer, 383 U.S. 75, 85, 86 S.Ct. 669, 675, 15 L.Ed.2d 597, 605 (1966).
[12] Monitor Patriot Co. v. Roy, 401 U.S. 265, 91 S.Ct. 621, 628, 28 L.Ed.2d 35 (1971).
[13] Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).
[14] New York Times Co. v. Sullivan, 376 U.S. 254, 279, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964).
[15] Local 496, Letter Carriers v. Austin, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).
[16] St. Amant v. Thompson, 390 U.S. 727, 730-31, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). See, Robertson, supra, pp. 201-212.
[17] 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).
[18] Id. at 43. See, Francis v. Lake Charles American Press, 262 La. 875, 265 So.2d 206 (1972) in which this Court applied the Rosenbloom standard.
[19] 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).
[20] J. Eaton, The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer, 61 Va.L.Rev. 1349, 1366 (1975).
[21] Gertz, supra, at 342-43, 94 S.Ct. 2997.
[22] Id. at 347-48, 94 S.Ct. 2997.
[23] Id. at 348-50, 94 S.Ct. 2997.
[24] Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 59, 91 S.Ct. 1828, 29 L.Ed.2d 321 (1971) (White, J., concurring).
[25] 376 U.S. at 292, n. 30, 84 S.Ct. at 732.
[26] A. Hanson, Libel and Related Torts, § 141, Supplement No. 3 (1976).
[27] 418 U.S. 264, 284, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745, 761 (1974). A local union's publication of a "list of scabs" followed by Jack London's "definition of a scab" expressed in most abusive language was held to be privileged because "such an opinion, even in the most pejorative terms, is protected under federal labor law." 418 U.S. 284, 94 S.Ct. 2781. See also, Greenbelt Cooperative Publ. Assn. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970).
[28] Restatement of Torts 2d, § 566, p. 172 (1977).
[29] 418 U.S. at 340, 94 S.Ct. at 3007, 41 L.Ed.2d at 805.
[30] Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498, 1506 (1957), quoted with approval in New York Times v. Sullivan, supra, at 376 U.S. 269, 84 S.Ct. at 720, 11 L.Ed.2d at 700.
[31] New York Times Co. v. Sullivan, 376 U.S. at 292, n. 30, 84 S.Ct. at 732, 11 L.Ed.2d at 713.
[32] See, Robertson, Defamation and the First Amendment: In Praise of Gertz v. Robert Welch, Inc., 54 Texas L.Rev. 199, 215 (1976) for discussion of the applicability of the Gertz decision to cases of defamation by others than publishers and broadcasters.
[33] Hanson, § 139, p. 104; Harper & James, § 5.28, p. 458. Comment, Developments in the Law of Defamation, 69 Harv.L.Rev. 875, 927 (1956).
[34] Harper & James, § 5.28, p. 458.
[35] Restatement of Torts, 2d ed., § 566, p. 171.
[36] Id.
[37] Id.
[38] Harper & James, § 5.28, p. 459.
[39] Gatley, § 709, p. 295.
[40] Restatement of Torts, 2d, § 566, p. 172.
[41] Gatley, § 711, p. 297.
[42] E. g., Madison v. Bolton, 234 La. 997, 102 So.2d 433 (1958) (see extensive authorities cited); Matassa v. Bel, 246 La. 294, 164 So.2d 332 (1964); Flanagan v. Nicholson Publishing Co., 137 La. 588, 68 So. 964 (1915); See, Comment, Defamation: A Compendium, 28 La.L.Rev. 82 (1967); Comment, DefamationConditional Privilege in Louisiana, 6 La.L.Rev. 417 (1945); Cf. La.R.S. 14:49. This statute, which establishes a defense of qualified privilege to criminal defamation, in pertinent part, provides: "A qualified privilege exists and actual malice must be proved, regardless of whether the publication is true or false, in the following situations:

"* * * (2) Where the publication or expression is a comment made in the reasonable belief of its truth, upon,
"(a) The conduct of a person in respect to public affairs; or
"(b) A thing which the proprietor thereof offers or explains to the public.
"* * *."
The "Reporter's Comment" indicates that the statute is a substantial codification of the law of "qualified privilege" recognized by the Louisiana civil jurisprudence.
[43] See, La.Const. of 1974, art. I, § 7. See, State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts, Vol. XIII, 41st day, pp. 41-52; 42nd day, pp. 9-53.
[44] The original petition does not specifically point to these statements as being libelous, but in brief and oral argument plaintiff's counsel indicated that they are the basis of this suit.
[45] One statement does not fit in any of the categories. In his deposition Collin indicated that he may have exaggerated when he said there had been "more than the usual amount of letters telling me to try" the restaurant. However, under the pleadings, affidavit, and deposition on file, this statement clearly was not defamatory.
[46] "To deny to the press the right to use hyperbole, under the threat of removing the protecting mantle of New York Times would condemn the press to an arid, desiccated recital of bare facts." Time, Inc. v. Johnston, 448 F.2d 378, 384 (4th Cir. 1971).
[47] See footnote 6, supra.
[48] See footnote 32, supra.
[49] La.C.C.P. art. 966; Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La. 1976).
[50] Weinberger v. Hynson, Wescott & Dunning, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973).
[51] United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Moore's Federal Practice, § 56.15[1]; Green v. Southern Bell Tel. & Tel. Co., 204 So.2d 648 (La.App. 3d Cir. 1968).
[52] La.C.C.P. art. 967; Cates v. Beauregard Electric Cooperative, Inc., supra, 369.
[53] New York Times v. Sullivan, supra, 376 U.S. at 285, 84 S.Ct. at 728, 11 L.Ed.2d at 710.
[54] See, e. g., Cervantes v. Time, Inc., 464 F.2d 986 (8th Cir. 1972); Bon Air Hotel v. Time, Inc., 426 F.2d 858 (5th Cir. 1970); Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir. 1969); United Medical Laboratories v. CBS, 404 F.2d 706 (9th Cir. 1968).
[55] Cates v. Beauregard Electric Cooperative, Inc., supra, at 370; Washington Post Company v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966) (citing authorities at 967-68).
[56] 125 U.S.App.D.C. 32, 365 F.2d 965 (1966).
[57] Id. at 968.
[58] See, Wright & Miller, Federal Practice and Procedure, § 2730, p. 591 (1973).
[59] Peagler v. Phoenix Newspapers, Inc., 114 Ariz. 309, 560 P.2d 1216 (1977); Corbett v. Register Publishing Co., 33 Conn.Supp. 4, 356 A.2d 472 (Super.Ct.1975); Cahill v. Hawaiian Paradise Park Corp. (Haw.), 543 P.2d 1356 (1975); Troman v. Wood, 62 Ill.2d 184, 340 N.E.2d 292 (1976); Gobin v. Globe Publishing Co., 216 Kan. 223, 531 P.2d 76 (1975); Jacron Sales Co. v. Sindorf, 276 Md. 580, 350 A.2d 688 (1976); Stone v. Essex Cty. Newspapers, Inc. (Mass.), 330 N.E.2d 161 (1975); Thomas H. Maloney & Sons, Inc. v. E. W. Scripps Co., 43 Ohio App.2d 105, 334 N.E.2d 494 (1974), cert. denied, 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975); Martin v. Griffin Television, Inc., 549 P.2d 85 (Okl.1976); Taskett v. King Broadcasting Co., 86 Wash.2d 439, 546 P.2d 81 (1976).
[60] Walker v. Colorado Springs Sun, Inc., 188 Colo. 86, 538 P.2d 450 cert. denied, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc. (Ind.App.), 321 N.E.2d 580 (1975), cert. denied, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); Chapadeau v. Utica Observer-Dispatch, Inc., 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975).
[61] For excellent discussions of this area of law and anticipated developments, see, Robertson, Defamation and the First Amendment: In Praise of Gertz v. Robert Welch, Inc., 54 Tex.L. Rev. 199 (1976); Anderson, A Response to Professor Robertson: The Issue is Control of Press Power, 54 Tex.L.Rev. 271 (1976); Eaton, The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer, 61 Va.L.Rev. 1349 (1975).