JENNIFER WALKER ELROD,
Circuit Judge, concurring in part and dissenting in part:
I agree with the panel opinion that the district court properly dismissed Dr. Ioppolo’s claims for abuse of process, abuse of right, and intentional infliction of emotional distress, as well as his defamation claim against the American Association of Neurosurgeons (“AANS”). I write separately because, in my view, Drs. Rumana and Cuffe were not entitled to summary judgment on Dr. Ioppolo’s defamation claims against them.
This case arises out of the expert testimony that Dr. Ioppolo offered against Dr. Vogter — a former business partner of Drs. Rumana and Cuffe — in a medical malpractice case. Dr. Ioppolo offered testimony suggesting that Dr. Vogter did not follow proper hospital policy in a case where a ten-year-old boy ultimately became quadriplegic. Specifically, Dr. Ioppolo testified *334 that he reviewed CT films which showed hematoma on the boy’s CT scan. Dr. Ioppolo further testified that the hematoma compressed the boy’s spinal cord, and that standard hospital policy suggested that Dr. Vogter should have given the boy steroids and performed a decompressive surgery on the hematoma.
Drs. Ioppolo, Rumana, and Cuffe were all members of the professional association AANS. After the malpractice case settled, Drs. Rumana and Cuffe filed a complaint against Dr. Ioppolo with the AANS’s Professional Conduct Committee (“PCC”) regarding his testimony against Dr. Vogter. In their complaint, they alleged that Dr. Ioppolo’s testimony was “false, inaccurate and constituted a violation of the AANS Expert Witness Rules.” Both Drs. Rumana and Cuffe subsequently participated in the PCC’s proceedings against Dr. Ioppolo. According to Dr. Ioppolo, Drs. Rumana and Cuffe’s testimony included “prejudicial and unsubstantiated allegations about the factual background” of the malpractice case. For example, the physicians testified that no doctor could have seen a hematoma compressing the boy’s spinal cord on a CT scan. Dr. Ioppolo asserts that these statements were later incorporated into the PCC’s resulting report. The PCC report found that Dr. Ioppolo “demonstrated a lack of adequate subject matter knowledge [in the malpractice case] and acted as an advocate for the plaintiff’s attorney rather than as an unbiased witness.” The AANS Board reviewed the PCC report, and unanimously approved a two-year suspension for Dr. Ioppolo.
Before Dr. Ioppolo had a chance to make use of the appeals process available within the AANS for such reports, Drs. Rumana and Cuffe mailed copies of the PCC report to the Louisiana State Board of Medical Examiners (“LSMB”) and the Louisiana Workers’ Compensation Corporation (“LWCC”). These reports were accompanied by letters from Drs. Rumana and Cuffe purporting to summarize the PCC report and including a number of negative statements about Dr. Ioppolo. For example, one letter stated that “Dr. Ioppolo gave false, misleading expert testimony;” that he “was a biased expert, not an impartial one;” and that his testimony was “scientifically baseless and irresponsible advocacy.” Dr. Ioppolo then filed suit against the AANS and Drs. Rumana and Cuffe alleging, among other things, that the statements in the report and letters were defamatory.[1]
The panel opinion holds that the PCC report and the accompanying letters sent by Drs. Rumana and Cuffe were statements of opinion, and that even if they were not, the statements would still be immune from a defamation claim because they are subject to a qualified privilege. I respectfully disagree.
“The distinction drawn between opinion and statement of fact has long been important at common law because most states restricted the privilege of fair comment to expressions of opinion.” Mashburn v. Collin, 355 So.2d 879, 885 (La.1977) (citation omitted).
Although difficult to state in abstract terms, as a practical matter, the crucial difference between statement of fact and opinion depends upon whether ordinary *335 persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker’s or writer’s opinion, or as a statement of existing fact.
Id. (citation omitted).
I agree with the panel opinion that the PCC report contains a number of opinions, and that such opinions are protected from defamation claims by the First Amendment. See id. (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 283, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). However, not all of the statements that Dr. Ioppolo complains of can be fairly characterized as opinions. For example, Drs. Rumana and Cuffe’s letter to the LSMB stated that “Dr. Ioppolo gave false testimony which was not supported by any medical literature in this case.” An ordinary person reading this statement would likely understand this to be a statement of fact: Either Dr. Ioppolo did, or did not, give false testimony. Only a fact can be true or false. Indeed, as Dr. Cuffe himself notes, two of the synonyms for “false” are “contrary to fact” and “counterfactual.” Thus, the statement that Dr. Ioppolo gave false testimony is best characterized as a statement of fact, rather than an opinion.
Because not all of Drs. Rumana and Cuffe’s statements were protected opinions, I next turn to whether their statements were covered by qualified privilege. “[T]he analysis for determining whether a conditional privilege exists involves a two-step process.”[2] Kennedy, 935 So.2d at 682. “First, it must be determined whether the attending circumstances of a communication occasion a qualified privilege.” Id. “Attending circumstances” include the “communication of alleged wrongful acts to the officials authorized to protect the public” such as when a member of the public alerts the police of potentially dangerous or criminal activity. Id. Louisiana has also recognized a qualified privilege for “communications between an employer and the Department of Employment Security” regarding the reasons for an employee’s termination. Watson v. Willis-Knighton Med. Ctr., 93 So.3d 855, 860 (La.App. 2 Cir.2012) (citing Kosmitis v. Bailey, 685 So.2d 1177 (La.App. 2d Cir.1996)).
“The second step of the analysis is a determination of whether the privilege was abused, which requires that the grounds for abuse — malice or lack of good faith— *336 be examined.” Id. “While the first step is generally determined by the court as a matter of law, the second step of determining abuse of a conditional privilege or malice is generally a fact question for the jury [ujnless only one conclusion can be drawn from the evidence.” Id. (internal quotation marks and citations omitted); see also William Lloyd Prosser & W. Page Keeton, Prosser & Keeton On Torts § 115 at 835 (5th ed.1984).
Even assuming arguendo that Drs. Rumana and Cuffe met the first step in the qualified privilege test, the district court should not have granted summary judgment because a fact issue remains as to whether Drs. Rumana and Cuffe abused the privilege by acting with actual malice. The practical effect of asserting a conditional or qualified privilege is to rebut the plaintiff’s allegations of malice and to place the burden of proof on the plaintiff to establish an abuse of the privilege.[3] Kennedy, 935 So.2d at 683. Establishing an abuse of privilege requires the plaintiff to prove that the defendants acted with actual malice-that is, with knowing falsity, or reckless disregard for the truth. Id. at 685.
Dr. Rumana argues that he and Dr. Cuffe “had every reason to believe the PCC report was ‘true’ ” because it was the result of the PCC’s evidentiary proceeding against Dr. Ioppolo. But as Dr. Ioppolo notes, the PCC report was based in part on Drs. Rumana and Cuffe’s own testimony. If, as Dr. Ioppolo asserts, Drs. Rumana and Cuffe knew that their testimony and allegations were untrue, then they certainly had reasons to doubt the veracity of the resulting PCC report. In Kennedy, the Louisiana Supreme Court explained that summary judgment was appropriate because “there is no allegation and certainly no evidence to support a contention” that the defendants knew their statements were false. Id. at 687-88; see also id. at 688 (“In fact, Kennedy’s petition alleges only negligence on the part of [the defendants].”). By contrast, the very heart of Dr. Ioppolo’s case is his contention that Drs. Rumana and Cuffe gave the PCC false information in order to harm him.
The summary judgment record included Dr. Ioppolo’s affidavit, which states:
At the [PCC] meeting, [Drs.] Rumana and Cuffe submitted an extensive presentation which was misleading, speculative, false and prejudicial in nature, and which included hearsay, matters not in the medical records and representations which were simply untrue.
Apparently emboldened by the preliminary report and in complete disregard for the by-laws of the AANS to the appeal, [Drs.] Rumana and Cuffe commenced a systematic disbursement of the report of the PCC to my employers, colleagues and others, sending facsimiles to these entities, attaching copies of the opinion which was based upon their falsehoods and misrepresentations.
They included a copy of the report, though they knew that those findings were disputed, that they were not final and that they were not allowed [to] be made public.
*337 The record also included the transcript of Drs. Rumana and Cuffe’s testimony before the PCC. Dr. Ioppolo identified a number of statements that the two doctors made, which Dr. Ioppolo claims were unsupported by any evidence. A reasonable jury could find that that making such unsupported statements, and then distributing a report based on those statements, demonstrated a reckless disregard for the truth.[4] Dr. Ioppolo also submitted an affidavit from the President and CEO of the LWCC, Kristin Wall, stating:
I found it especially interesting that the complaints against Dr. Ioppolo were made by the defendant doctors in that case after they had settled their case and after he had been qualified to testify by the court and subjected to cross-examination by the remaining defendants.
Viewed in the light most favorable to Dr. Ioppolo, these statements create a fact issue as to whether Drs. Rumana and Cuffe abused their qualified privilege. In addition to these affidavits, Dr. Ioppolo’s position could also be supported by the fact that Drs. Rumana and Cuffe chose to send out the PCC report before Dr. Ioppolo had a chance to exhaust the AANS appeals process and challenge the report’s findings. This refusal to wait and ensure that any errors in the report were corrected could serve as evidence that they showed a reckless disregard for the truth. Because more than “one conclusion can be drawn from the evidence,” the district court should not have granted summary judgment on Dr. Ioppolo’s defamation claim against Drs. Rumana and Cuffe. Kennedy, 935 So.2d at 682.

. Attacks, such as these, on an expert witness’s professional standing can also negatively impact the ability of plaintiffs to bring medical malpractice cases by making physicians less willing to testify against other members of their profession. See, e.g., James A. Lowe & Mark L. Wakefield, Am. L. Prod. Liab.3d § 68:33 (noting that finding an expert witness in a medical malpractice case is "usually a hair-pulling experience”).

. The district court incorrectly applied an earlier standard for qualified privilege based on our decision in Rouly v. Enserch Corp., 835 F.2d 1127, 1130 (5th Cir. 1988). Since that decision, however, the Louisiana Supreme Court has adopted a new test, which we must apply. See Vandenbark v. Owens-Ill. Glass Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941); Charles Alan Wright & Mary Kay Kane, 20 Fed. Prac. & Proc. Deskbook § 61 (‘‘[U]nder the Erie rule it is never too late to change in conformity to some new pronouncement of state law, and a court of appeals must rely on the latest state decisions even though they come after the federal court decision that the appellate court is reviewing.”). As the Louisiana Supreme Court explained:
Early appellate court decisions in Louisiana characterized the conditional or qualified privilege as applying if the communication is made (a) in good faith, (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duly, (c) to a person having a corresponding interest or duty. Under this formulation, which finds its genesis in Madison's citation of a passage from an encyclopedia, courts typically focused on the requirements of good faith and proper publication to determine in the first instance if the privilege applied. In Smith v. Our Lady of the Lake Hospital, Inc., [639 So.2d 730 (La.1994)], we eschewed that approach [in favor of the two-step analysis].
Kennedy v. Sheriff of E. Baton Rouge, 935 So.2d 669, 682 (La.2006).

. Dr. Ioppolo has alleged defamation per se, which would ordinarily shift the burden to Drs. Rumana and Cuffe to prove good faith or a lack of malice. See Kennedy, 935 So.2d at 675 (“When words are defamatory per se, malice as well as injury are presumed, but may be rebutted by the defendant.”). However, because Drs. Rumana and Cuffe asserted a qualified privilege, the burden once again shifted back to Dr. Ioppolo to show malice. Id. at 683. In order to survive summary judgment, he had to put forth evidence showing an issue of material fact on this issue.

. Dr. Ioppolo’s own affidavit alone would be sufficient to survive summary judgment. See C.R. Pittman Constr. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford, 453 Fed.Appx. 439, 443 (5th Cir.2011) (”[A]n affidavit based on personal knowledge and containing factual assertions suffices to create a fact issue, even if the affidavit is arguably self-serving.”); see also Rushing v. Kan. City S. Ry., 185 F.3d 496, 513 (5th Cir. 1999) ("[Mjerely claiming that the evidence is self-serving does not mean we cannot consider it or that it is insufficient. Much evidence is self-serving and, to an extent, conclusional."), superseded on other grounds by Fed.R.Evid. 103(a).