STATE OF MAINE  
PISCATAQUIS, ss.

SUPERIOR COURT  
CIVIL ACTION  
DOCKET NO. CV-97-20

RICHARD ANNUNZIATO, et al.,

     Plaintiffs

v.

     ORDER

T-M CORPORATION, et al.,

     Defendants.

This litigation originally concerned certain rights and liabilities of owners and developers of the Kineo peninsula and Rockwood dock areas of Moosehead Lake. It began in 1997 when two landowners, Richard and Kathleen Annunziato, filed a five-count complaint against the Kineo developer, T-M Corporation ("T-M"), individuals associated with the corporation, the owners association, and several other Kineo landowners. The complaint prompted the defendants to file a variety of counterclaims, cross-claims, and third party complaints. The Court decided many of the issues that were raised by these pleadings by partial summary judgment orders and eventually decided most of the remaining issues, after trial, by Order dated May 9, 2005. The case then remained inactive for a period of time until September 25, 2007, when the Mitchell cross-claimants filed a motion to determine future proceedings. The Court then issued an order requiring T-M to indicate whether it had any unresolved claims in the litigation. After receiving T-M's response, the Court conducted further proceedings to resolve all remaining claims.

On March 22-24, 2011, the Court conducted a trial in this matter, and heard evidence on four separate issues: (1) the cross-claim of James and Elizabeth Mitchell against T-M for a portion of "net profits" from the sale of common land, based on their

Received & Filed

Piscataquis County  
Clerk's Office

1

1988 agreement (Cross-Claimants' Ex. F-2); (2) the Mitchells' cross-claim related to a provision in that agreement requiring T-M to perform certain work on the Mitchell lots; (3) T-M's counterclaim against the Annunziatos for business defamation and slander of title; and (4) T-M's counterclaim against the Annunziatos for foreclosure based on their alleged failure to pay association assessments. The Court received evidence on all issues except for the foreclosure claim, deferring hearing on that claim until it decided the Annunziatos' motion for judgment as a matter of law on that count. It was decided at the time that there would be no further hearing if the motion were granted, but further hearing would be required if the motion were denied.

## I. MITCHELL CROSS-CLAIMS

In March of 1988, T-M purchased a large tract of land bordering Moosehead Lake consisting of a peninsula upon which a grand hotel had once been located, as well as a dock and surrounding land in Rockwood, the customary point of access to the peninsula. On a portion of the property there existed a forty-eight-lot subdivision already approved by the Land Use Regulatory Commission ("LURC"). Remaining on the peninsula were some structures that had been appurtenant to the hotel, but they had been neglected and were in a state of disrepair. A golf course was also located on the peninsula, but it had not been recently maintained. Approximately ten of the forty-eight lots had already been sold at the time of T-M's purchase, and most of the remaining land was designated as common land or occupied by the golf course. Most of the initial litigation concerned the rights of the landowners and developers to the use, sale, or development of the common land.

James E. Mitchell and Elizabeth H. Mitchell were the record owners of Lots 10 and 11 in the subdivision prior to T-M's purchase of the Kineo property. After T-M's purchase, Gary Merrill, the president of T-M, desiring to cause its relationship with the

2

Mitchells and other original owners to be identical to its relationship with future purchasers vis-à-vis the enforceability of restrictions and covenants (including rights to the common land), negotiated with the Mitchells a deed swap, which required the Mitchells (the original owners) to relinquish their rights under the original subdivision plan and become subject to a new Declaration of Covenants and Restrictions. As a part of this negotiation, T-M and the Mitchells entered into an agreement in which the Mitchells relinquished their pre-existing rights to the "common land" designated in the original subdivision plan. (cross-claimants' ex. F-2) In exchange, T-M agreed to: (1) pay the Mitchells one-twentieth of all net profits made on the sale or development of the common lands, and (2) install, at the Mitchell's request and T-M's expense, driveways on the Mitchell lots (10 and 19), clear and clean up those lots, and install, at the Mitchell's request and T-M's expense, septic systems on the lots in accordance with LURC permits, provided that the Mitchells pay for the cost of all materials necessary for the installation. These two provisions are the subject of the cross-claims that the Court now addresses.

A. NET PROFITS DUE

T-M sold parcels of common land after making the 1989 agreement. In 1994, the company sold the golf course for approximately $100,000 and paid the Mitchells 5% of the profit from the land portion of the sale.[1] The company sold the Rockwood portion of the common land upon which the dock was located for $250,000 in 1990, and in 1998 it sold a portion of the common land called the "hillside" for $100,000. T-M did not pay any sums to the Mitchells reflective of either of these sales. Additionally, T-M conveyed its remaining common land—described as Lot 65 and comprised of, most importantly, "the shorefront," a narrow strip comprising most of the shorefront involved in the

---

[1] The Mitchells are making no claim related to this transaction.

3

development—to the Kineo Community Owners Association in 1998, receiving no direct monetary proceeds from the conveyance. The strip was over 4,000 feet long and generally followed the perimeter of the development, between the lots and the shore of the lake, and the tax-assessed value of the parcel at the time of the conveyance was $388,200. The Mitchells assert that they should be awarded 5% of a sum comprised of the $350,000 in proceeds plus the $388,200 assessed value of the shorefront lot. T-M and Merrill assert there were no net profits from these conveyances.

The concept of "net profit" as applied to the facts of this case is not easily defined. The term is not defined in the agreement, and no accountants, appraisers or similar experts testified at trial. In the absence of such guidance in ascertaining an appropriate definition, the Court adopts a generic definition: "total sales revenue less the cost of goods sold and all additional expenses." *Black's Law Dictionary* 1329 (9th ed. 2009). The Court will attempt to apply this definition to the facts of this case in order to determine the net profit derived from the sale/conveyance of common land. The Court will first determine what revenue was generated from sales and then evaluate cost and related expense.

> 1.   Determining Net Profit from Revenue and Cost Calculation for Each Parcel
>
>     a.   Revenue Derived from Sale

First, the Court turns to an analysis of T-M's proceeds from the sale of common lands. Clearly, it gained $350,000 from the sale of the hillside and Rockwood properties. It is less clear whether T-M received any sales revenue from its conveyance of the back land and shorefront strip. To begin the analysis, the Court will attempt to evaluate the value of the benefit to T-M. The Mitchells assert that the benefit is equal to the value of the property. Even if the Court accepted this proposition, it is not convinced that the fair

4

market value of the property is equal to its assessed value. To the contrary, a variety of factors, such as market forces and the availability of a buyer, can affect what a seller receives. Although Mr. Merrill opined that the property was very valuable in his deposition, the Court does not necessarily agree. The subdivision plan did not permit development of the narrow strip of shorefront. The potential buyers who would be most interested in this land would be the owners association, or perhaps individual owners or groups of individual owners, the very people with whom T-M had been involved in expensive litigation of uncertain outcome. A purchaser would also be required to pay the expensive property taxes related to the property, a motivating factor in T-M's decision to convey it. The Court was not provided with any evidence concerning how the assessed value was ascertained and it seriously doubts that the fair market value of the shorefront and back land was equal to its assessed value.

Additionally, there is no reliable method that can be used in valuing the benefit conferred upon T-M by the settlement. Although T-M obviously thought it was receiving a benefit in the conveyance, it is difficult to quantify the benefit because it is dependent on the potential outcome of the litigation had there been no settlement, a factor that is obviously unknown. Although the result would arguably be different different if T-M had sold or conveyed the property for less than market value to avoid or minimize its payment to cross-claimants, this conveyance was a logical effort to reduce litigation expense and avoid a potentially adverse outcome in the litigation.

Most fatal to the claim that the proceeds were $388,200, however, is the fact that the 1988 agreement does not provide support for this conclusion because the agreement refers to "net profit on the sale or development of the common lands." There is no reference to a non-cash conveyance and there is no provision that gives assessed value a role in the computation. Based on the facts presented here, the Court discerns no

authority for imputing assessed value as sales proceeds related to this conveyance. The contract did not guarantee that cross-claimants would receive a minimum value for each conveyance of common land, but only that they would receive the net profit related to the actual sales revenue that was generated. Based on this analysis, the Court concludes that T-M's gross sales proceeds from the common land sales is limited to $350,000.

      b.      Cost of Common Land and Related Expense

Relevant records, such as relevant tax returns that may have shown profits or losses related to specific sales, or contained information relevant to the determination of cost and expense, were not admitted.[2] There has been no attempt to assign a specific value or cost at the time of T-M's purchase to any lot that T-M later sold, or to a specific portion of the common land, or to any other property such as the golf course or the Breakwater Clubhouse. It is not possible, on the state of the evidence, to assign an original value or cost to T-M for any specific property that T-M later sold. Additionally, it is not possible to adjust that original cost by adding legitimate business expense directly or indirectly related to a particular parcel, and then subtract that adjusted cost from its the sale price to arrive at a net profit. Because of this, the Court will abandon a parcel-by-parcel approach, and instead will attempt to determine T-M's approximate investment in the overall project, determine its overall sales proceeds for the project, and, if there is a "net profit," somehow apportion part of it to the common land.

      2.      Overall Cost to T-M and Overall Sales

T-M bought the property in 1988 for $2,250,000. Mr. Merrill testified that the company borrowed $3,100,000 to not only purchase the property, but also to improve

---

[2] T-M claims that it furnished all of the tax returns that it possessed in discovery. The Court has been provided no information to the contrary.

the property and its infrastructure. The company, intending to implement the basic development already approved by LURC, spent large sums to improve the golf course that had not been maintained, even installing new greens. The company paid for improvements to the Rockwood portion of the property, painting and repairing existing structures, and installing underground storage tanks. It also paid for improvements to the exterior of the cottages it owned on the peninsula, and for landscaping. T-M spent sums to try to establish an access road to the property via a paper company road and to tear down the hotel annex and haul away the remains. Perhaps most importantly, it paid to install over three miles of underground power and telephone cable, and to upgrade existing roads in the development. Finally, it incurred attorney fees during the extended litigation encountered in developing this subdivision. The Court finds that making all of these improvements must have cost a substantial sum, consistent with the overall amount borrowed, and believes the testimony that T-M spent at least $3,100,000 to purchase and improve the property.

The parties presented specific evidence concerning the proceeds of T-M's sale of Kineo subdivision lots and properties. Testimony reveals that sales of real estate in this subdivision, exclusive of common land sales, yielded $2,406,500 to T-M. Additionally, T-M gained a total of approximately $450,000 from its sale of the Rockwood, hillside, and golf course properties. Even if the Court were required to characterize the benefit associated with the shorefront conveyance as sales proceeds, it cannot find that the value thus ascertained approached the assessed value.

3.    Net Profit Calculation

The Mitchells implicitly argue that there should be no cost or expense attributed to the common land and that the Court should declare that the entire proceeds is net profit. The Court discerns no support for this argument unless it imposes a burden shift

7

in this case and finds that because T-M did not present specific evidence related to cost and expense for each parcel of common land, it had no cost or expense.[3] The Court has reviewed the case law that allegedly provides support for requiring that cross-claim defendant have the burden of proving cost and expense related to the sale of common land. In *Patten v. Milam*, 480 A.2d 774, 776 (Me. 1984), the Court required that a medical malpractice defendant prove that he was in this state rather than require that the plaintiff prove that defendant was in another state, for purposes of determining whether the statute of limitations was tolled. The Court's reasoning was based of the proposition that the facts relevant to that analysis were "peculiarly within the knowledge of the defendant." *Id.* In *Jacobs v. Jacobs*, 507 A.2d 596, 602 & n.5 (Me. 1986), the Court intimated in a footnote that the doctrine could possibly be applied to require a spousal support payee to prove lack of cohabitation when the payor was claiming that support should terminate because the payee was cohabitating.

This Court will not adopt the doctrine here because there is ample evidence of T-M's overall cost and sales, and it is obvious that T-M spent substantial sums on legitimate improvements to the development, although the evidence is insufficient to assign cost and expense values to specific lots or parcels. Furthermore, the cross-claimants could have done more to obtain information relevant to cost basis on its own, in the form of expert testimony to apportion initial purchase cost among the lots and parcels that were eventually sold, including the common lands. Additionally, the passage of time while this case was dormant would have had the natural effect of increasing the likelihood that either side could be missing documents at the time of

---

[3] Cross-claimants also argue that no improvement expense was incurred to improve the common lands. This statement is not accurate because T-M spent money to improve the Rockwood property. Additionally, the value of the common land is obviously related to its location in a developed subdivision with a golf course, power, and improved roads, and a portion of those costs should be apportioned to the common lands.

8

trial. Under these circumstances, it would be inappropriate for the Court to impose a burden shift in this case.

Based on the foregoing analysis, the Court concludes that T-M's proceeds from the sale of land in this subdivision did not exceed their overall investment of at least $3,100,000, and that T-M had no net profit as a result of its activities on Kineo and enjoyed no net profit in its sales of common lands.

B.    SUMS DUE FOR CLEARING, DRIVEWAY INSTALLATION, AND SEPTIC INSTALLATION

According to the 1988 agreement (Cross-Claimants' Ex. F-2), T-M was required to install driveways and clear and clean up Lots 10 and 19 in accordance with a building permit issued by LURC, when requested to do so by the lot owner. Also, upon request, T-M was required to install septic systems in accordance with the permit, but the owner of the lot was responsible for payment for all materials necessary for installation. In 2004, Mr. Mitchell requested, orally and in writing, that T-M begin clearing and install a driveway and septic system on Lot 10. Upon T-M's failure to respond, cross-claimants had the work done and then sought to bill T-M. Having received no compensation, Mr. Mitchell included this claim in the breach of contract cross-claim. Additionally, the claim encompasses a theory of anticipatory breach with regard to Lot 19.

Charles Foster performed the clearing and installation on Lot 10, using Ram Land Development Co. LLC's equipment. By agreement, Foster operated the equipment to work off a $2,500 debt he owed to the Mitchells, who were to pay Ram directly for the use of the equipment. For the purpose of deciding this claim, and consistent with the testimony of Ram's owner, Mr. Mello, the Court considers gravel as a material that T-M does not have to provide. The Court makes the following findings concerning the expenses that T-M is obligated to pay:

9

(1) Ram invoice 128 includes a charge of $3,604 for septic, but according to the testimony of Mr. Mello, that amount includes septic system materials that cost $2,000. The Court classifies the October 21 charge of $900 and the October 22 charge of $540 as expenses that T-M is required to pay according to the agreement. The Court finds that the term "graveling" relates to the distribution of gravel, not the cost of the gravel. Gravel had been stockpiled on Lot 19 prior to this project. The remainder of the charges on the invoice are not relevant to the agreement.

(2) Ram invoice 136 includes relevant charges of $720, consisting of hauling gravel and finish grading the driveway.

(3) Ram invoice 112 contains charges of $3,044 that are related to clearing the lot, a covered expense.

Based on these findings, the total expense that T-M should have paid is $9,324, including $2,500 for Foster's labor.

Additionally, the cross-claimants assert an anticipatory breach of the agreement with regard to Lot 19. An anticipatory repudiation of a contract is a party's definite and equivocal manifestation of intention that the party will not render the promised performance when the time fixed for it in the contract arrives. The manifestation can be by words or conduct, but must be definite, unequivocal, and absolute. *Wholesale Sand & Gravel, Inc. v. Decker*, 630 A.2d 710, 711 (Me. 1993). The Court does not find anticipatory breach in this case. The cross-claimants have not requested that work be performed on Lot 19, have not sited a structure on the lot, and have not informed T-M that they have obtained any necessary permits. Under these circumstances, T-M could not perform its obligation under the agreement. The fact that there has been litigation concerning T-M's obligations with regard to Lot 10 demonstrates that the parties disagree on what amounts T-M owes, not that it will refuse to meet its obligations with regard to Lot 19.

10

## II.    T-M COUNTERCLAIMS

### A.    SLANDER

In Counterclaims IV-VI, T-M asserts that Richard and Kathleen Annunziato made statements to others concerning the common lands in the Kineo development in order to discourage them from purchasing lots in the subdivision. It alleges generally that they aggressively told prospective buyers of ongoing litigation and made statements to inform others that they, the Annunziatos, had an ownership interest in the common land. T-M also alleges that they told Mr. Foster, a prospective buyer of the Breakwater Clubhouse, that they had an ownership interest in that property in order to discourage him from purchasing it. It is also claimed that earlier the Annunziatos had discouraged William Clark from purchasing the Breakwater property because of their assertions about their ownership of the common lands. T-M also claims that some of their correspondence with the Department of Conservation is corroborative of the Annunziatos' slanderous intent.

In Maine, to prove slander of title, the claimant must prove that the defendant published a slanderous statement disparaging the plaintiff's title to an interest in land; that the statement was false; that it was made with malice or with reckless disregard of its falsity; and that the statement caused actual damage. *Colquhoun v. Webber*, 684 A.2d 405, 409 (Me. 1996).[4] To be actionable, an allegedly false statement must be an assertion of fact and not merely an opinion. *Lester v. Powers*, 596 A.2d 65, 69 (1991). "The crucial difference between statement of fact and opinion depends upon whether ordinary

---

[4] The counterclaim plaintiffs asserted defamation in Count IV of their counterclaim, but have only submitted argument concerning Counts V-VI of the counterclaim, disparagement of property rights and slander of T-M's real estate. It appears that T-M is abandoning any separate claim of defamation apart from defamation-type claims affecting real estate.

persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact. *Caron v. Bangor Publ'g Co.*, 470 A.2d 782, 785 (Me. 1984) (quoting *Mashburn v. Collins*, 355 So. 2d 879, 885 (La. 1977)).

### 1. General Statements

Mr. Merrill testified that unidentified people told him that the Annunziatos told them that they, the Annunziatos, had an interest in the Kineo common lands and that there was litigation concerning the issue.[5] Charles Foster testified that he overheard the Annunziatos make similar statements about their ownership of the common land to unidentified third parties, and urged them not to buy. Counterclaim plaintiff maintains that the Annunziatos, who had a business ferrying people to the development, told potential buyers that they should not purchase land or property in the Kineo subdivision and generally discouraged them form buying.

The Court finds that the counterclaim defendants told others about the pending litigation, but made no false statements in this regard because substantial litigation had been pending for a long while. The Annunzitos also told others that they had an ownership interest in the common land and made statements to the effect that T-M did not own the common land, but in doing so were only expressing their opinion on the topic. This is clear because the statements were made in a context in which the listener also became aware that there was extended litigation over the issue of the ownership of the common land. If there was litigation over the common land, then its ownership was at issue and it is highly probable that the ordinary listener would perceive that the parties to the litigation, including the Annunziatos, would have nothing but opinions

---

[5] This testimony was admitted over a hearsay objection because it was not offered for the truth of the matter asserted, but only to prove that something was said.

12

concerning ownership, which had not been resolved. We do not know how the statements were in fact construed because the testimony was somewhat vague and no evidence was presented on this specific point.

Additionally, the Annunziatos subjectively believed that they had an ownership interest in the common land and did not make statements with reckless disregard for their falsity. In general, most purchasers of a lot in a subdivision containing property designated as "common land" would not necessarily conclude that the developer was free to sell it to others for whatever purpose. Additional factors relevant to the reasonableness of the Annunziatos' belief in this regard include: (1) the applicable subdivision permit stated that all of the shorefront and much of the interior will be held in common by the lot owners; (2) numerous lot owners in addition to the Annunziatos shared the belief that their consent was required before T-M could sell common land; (3) Mr. Merrill informed lot owners in 1989 that they were all member/owners of the golf course; and (4) the final subdivision plan designated such parcels as the shorefront and hillside area as common land, as did maps and advertising materials that T-M disseminated. The fact that T-M won a hard-fought legal battle over its ownership of the common land does not mean that its opponents held their beliefs recklessly.

2.      Statements to Clark and Foster

T-M asserts that if the Annunziatos had not made slanderous statements, similar to those described above, to Mr. Clark, he would have purchased the Breakwater Clubhouse at a substantially higher price than Charles Foster later paid. Mr. Clark denies that he made a formal offer, indicates that he only expressed interest in the property at the price that Foster ultimately paid, and denies that his decision against buying it had anything to do with comments by the Annunziatos. Because any comments that the Annunziatos made were expressions of opinion that were not

13

recklessly held, these claims are not actionable. Additionally, the Court believes Mr. Clark's testimony, and T-M has failed to prove damages even if the outcome on the issue of liability were different.

Mr. Foster testified that Mrs. Annunziato made general statements to discourage prospective buyers from purchasing lots, using such terms as "snake oil," "under litigation," and "smoke and mirrors." He testified that in 1995, Mrs. Annunziato told him that because she owned an interest in the common land she could come in and sit at his dinner table if he bought the Breakwater Clubhouse from T-M. He indicated that she and another lot owner, Mr. Rines, made similar comments to Mr. Foster's wife in a phone call. He said he perceived the comments to be idle talk. Again, these comments, although more colorful than others, were nothing more than the expression of an opinion and they were not made recklessly.

3.    Letters

The Annunziatos corresponded with the Department of Conservation on three occasions. On two occasions they asked that the hillside lot not be purchased as an acquisition for Land for Maine's Future. Although the Department ultimately removed the parcel from consideration, these letters were written after Mr. Foster had already purchased the parcel and no claim of damage could be asserted. The third letter concludes by asking LURC to investigate any "resulting permits or approvals" involving T-M activities. This is clearly a writing that expresses a request, not a fact, and cannot be considered slanderous, and is entirely consistent with the Annunziatos' good faith belief that T-M should not be able to sell any of the common land.

B.    FORECLOSURE

At the close of counterclaim plaintiff's case, the Annunziatos orally moved for judgment as a matter of law. The Court took the motion under advisement and

14

proceeded to hear evidence on all other issues, and reserved to the parties the right to present additional evidence, depending on the Court's ruling on the motion. The Court will now decide the motion.

In Count II of its counterclaim, T-M seeks a judgment declaring that the Annunziatos' interest in in their lot, Lot 5, be foreclosed, that the Court enforce its lien against the lot, and that it be declared the owner of the lot.[6] The lien mentioned in the complaint was filed in order to collect certain dues that the Annunziatos allegedly owed. In 1997, T-M attempted to avail itself of the so-called "strict foreclosure" provisions of 14 M.R.S. § 6203 (2006), *repealed by* P.L. 2007, ch. 391, § 3 (effective Sept. 20, 2007), to collect what it claimed was owed. It caused a notice of foreclosure to be served on the Annunziatos, and then recorded the notice in the Piscataquis County Registry of Deeds to begin the running of the one-year period of redemption. Because they did not want their property to be subject to the one-year period of redemption, the Annunziatos initiated a proceeding in Piscataquis County Superior Court in which they sought an order voiding the one-year period of redemption. When proceeding under this statute, the party seeking foreclosure must serve the opposing party with a notice of foreclosure and then record the notice in the appropriate registry of deeds within thirty days of service. *Id.* § 6203(2). Because T-M had recorded the notice in the registry forty-five days from service of the notice, the Court, by Order dated October 9, 1997, ruled that "T-M is barred from pursuing rights under purported foreclosure other than counterclaim here."

Counterclaim defendants assert that the foreclosure count should be dismissed because T-M now alleges the same foreclosure mechanism as it attempted to use in

---

[6] Actually, the lot owners had a duty to pay dues to the Kineo Community Owners Association who assigned the right to collect those dues to T-M.

1997. At that time, the Court barred T-M from pursuing foreclosure pursuant to 14 M.R.S. § 6203, the same statute, they claim, that is the subject of this counterclaim. Insisting that in order to legally foreclose, all steps mandated by statute must be strictly performed, *see Camden Nat'l Bank v. Peterson*, 2008 ME 85, ¶ 21, 948 A.2d 1251, the Annunziatos assert that the same recording problem—a failure to record the foreclosure notice within 30 days—requires the Court to dismiss Count II of the counterclaim. T-M asserts that the foreclosure count should not be dismissed because, after the ruling of October 9, 1997, it filed its counterclaim, asserting its right to foreclose against the Annunziatos' lot based on the provisions of their declarations[7] and their failure to pay dues. It does not argue against the Annunziatos' claim that the late filing is fatal to foreclosure brought under 14 M.R.S. § 6203, but argues that its foreclosure count pertains to a judicial foreclosure brought under different statutory provisions, namely 14 M.R.S. § 6321 (2010).

In Count II of its counterclaim, T-M seeks a judgment declaring and quieting title to Lot 5, citing 14 M.R.S. §§ 5951-5963 (2010) (declaratory judgments), 14 M.R.S. § 6651 (2010) (quiet title), and M.R. Civ. P. 80A. It alleges that its assignee, Kineo Community Owners Association,[8] served and duly recorded the "notice of foreclosure of lien" and states that the one year period of redemption has expired without any action on the part of counterclaim defendants to redeem the property, citing 14 M.R.S.A. §§ 6203, 6204 (2006), *repealed by* P.L. 2007, ch. 391, §§ 3-4 (effective Sept. 20, 2007). It specifically alleges that by virtue of 14 M.R.S.A. § 6204, the Annunziatos' right of redemption has been

---

[7] Referenced is the "Declaration of Covenants and Restrictions Kineo and Rockwood, Maine," dated May 1, 1989, and recorded in Book 723, Page 51 at the Piscataquis County Registry of Deeds.
[8] Apparently the serving and recording was accomplished by this entity. T-M's right to bring this claim as assignee has not been challenged.

16

forever foreclosed. It prays for a judgment declaring that the Annunziatos' interest in Lot 5 has been foreclosed, that the lien is valid, and that T-M is the owner.

Although the Court in 1997 envisioned that T-M could file a counterclaim alleging foreclosure, it did not dictate how that was to be alleged. It is clear to this Court that the counterclaim plaintiff chose a hybridized version of strict foreclosure to accomplish its goals, by combining concepts of declaratory judgment and quiet title with concepts of foreclosure as defined in 14 M.R.S. §§ 6203, 6204. Not only does T-M fail to mention the "judicial foreclosure" statute, 14 M.R.S. 6321, or any of its provisions, but in Count II it clearly seeks title to the property, relief not authorized by the latter statute. If the plaintiff prevails in "judicial foreclosure," it is not awarded title to the property foreclosed upon, but is granted the right to sell the property and apply the proceeds of sale to the debt, an entirely different species of foreclosure. Because of the differences between the two statutes, foreclosure by civil action under 14 M.R.S. §§ 6321-6325 (2010) is an alternative method to the foreclosure process that is provided in 14 M.R.S. §§ 6201-6203, 6204 (2006), *repealed by* P.L. 2007, ch. 391, §§ 1-4 (effective Sept. 20, 2007). *See U.S. Dep't of Hous. & Urban Dev. v. Union Mortg. Co.*, 661 A.2d 163, 165 (Me. 1995). Because the two different forms of foreclosure are fundamentally different, counterclaim plaintiff has, in fact, not proceeded pursuant to 14 M.R.S. § 6321, and has failed to follow the statutory requirements of the form that it chose to allege, the counterclaim defendants' motion for judgment as a matter of law is granted.

The Entry Is:

Judgment for cross-claim plaintiffs Mitchell on Count I of their cross-claim and against cross-claim defendant T-M Corporation, in the amount of $9,324 plus interest and costs.

17

Judgment for counterclaim defendants Annunziato on Counts II, IV, V, and VI of counterclaim plaintiff T-M's counterclaims.

Dated: December 7, 2011

WILLIAM ANDERSON
JUSTICE, SUPERIOR COURT

18